1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   BARRY EPSTEIN,                )  Docket No. 14 C 8431
                                  )
4              Plaintiff,         )  Chicago, Illinois
                                  )  August 1, 2017
5         v.                      )  1:58 p.m.
                                  )
6   PAULA EPSTEIN,                )
                                  )
7              Defendant.         )

8
            TRANSCRIPT OF PROCEEDINGS - Trial Excerpt
9                    OPENING STATEMENTS
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
10

11  APPEARANCES:

12

13  For the Plaintiff:    MS. NEJLA K. LANE
                          MS. ALEXANDRA OLKOWSKI
                          Lane Keyfli Law Ltd.
14                        5901 N. Cicero Avenue
                          Suite 200
15                        Chicago, IL 60646

16

17  For the Defendant:    MR. SCOTT A. SCHAEFERS
                          MR. RANDALL BOREK
                          Brotschul Potts LLC
18                        30 N. LaSalle Street
                          Suite 1402
19                        Chicago, IL 60602

20

21  Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
                          Official Court Reporter
22                        219 S. Dearborn Street, Room 1432
                          Chicago, IL 60604
23                        312.435.6053
                          laura_renke@ilnd.uscourts.gov

24

25

Opening Statement - Plaintiff

1      (Proceedings had not herein transcribed.)

2      (In open court in the hearing of the jury.)

3           THE COURT:  So with that, is plaintiff ready to make

4      her -- make the opening statement?

5           MS. LANE:  Ready, your Honor.

6           THE COURT:  You may proceed, Ms. Lane.

7           OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

8           MS. LANE:  Good afternoon, ladies and gentlemen.

9      Again, introduction.  I'm Nejla Lane on behalf of the

10     plaintiff.  I want to identify, when I talk in my opening

11     statement to the parties, who I'm referring to.  Plaintiff is

12     Dr. Epstein or Barry.  I will refer to him as plaintiff or

13     Barry.

14          I will also refer to Ms. Epstein either as Ms. Epstein

15     or the defendant.  And throughout, when I say "he," I mean

16     Barry.  When I say "she," I mean Ms. Epstein.

17          Having identified them as I'm going through it, this

18     is just a picture giving to you what the evidence will show

19     when all the evidence is presented to you before you deliberate

20     on this matter.

21          Honorable Judge Durkin already stated that this is

22     about wiretap violations.  I will address that toward the end a

23     little bit more.  But the evidence will show that Paula

24     illegally accessed her at-the-time husband, now former husband,

25     Barry's e-mail accounts.

Opening Statement - Plaintiff

1    And these e-mail accounts, the evidence will reveal,

2  are various.  These are work e-mails from an account ending in

3  RNCO, standing for Russell Novak & Company, and also his

4  private e-mails, which go -- ending with either yahoo.com or

5  att.net.

6    So the evidence will show that she illegally accessed

7  Barry's e-mails from her own e-mail or from her own accounts,

8  the accounts that she used to access these -- Barry's accounts

9  to forward certain e-mails or attach an auto-forward rule.  And

10  when I say "rule," I mean that somebody had gone previously

11  into an e-mail account and put in a forwarding address.  With

12  that forwarding address, any e-mail that this person Barry

13  would receive would automatically be sent to her without his

14  knowledge.

15    Auto-forwarding rule has changed over the time.  In

16  the past, it wouldn't give you a notification your account has

17  an auto-forwarding rule as it does today.  In the past days,

18  you could go in, set an auto-forward rule from one e-mail

19  address to another e-mail address, and come back at evening and

20  you can remove that without the knowledge of the person that

21  e-mail's being forwarded to.

22    Having said that, the e-mail accounts that Ms. Epstein

23  has used are also from work e-mail account which ends with

24  colum.edu or from her personal e-mails which is yahoo.com and

25  gmail.com.

4

Opening Statement - Plaintiff

1   And there's several e-mail addresses.  Sometimes if it

2 comes confusing when the evidence is shown, she has forwarded

3 this one type of e-mail, maybe two, multiple of her e-mails,

4 starting from her work e-mail, columbia.edu, to her Gmail

5 account.  So when you see the subject line, you will understand

6 what I'm referring to here.

7   And Paula has done all these almost secretly, without

8 even discussing or mentioning it to her husband then.

9   The evidence will show to you that the earliest

10 e-mails that we were able to discover during the discovery

11 period goes back to 2006.  These e-mail communications are

12 between Barry and multiple individuals -- third parties, I will

13 call -- communications about his mother, who since is deceased,

14 communications with his partners at work.  I will give you

15 detail of list of which e-mails Paula was accessing and

16 forwarding to.

17   And before I go to more details, since we are here

18 trying to abide by the law, I would like to mention to you

19 something that is very dear to me that our second president,

20 John Adams, once stated or enshrined the concept of, a

21 government of laws, not of man.

22   This means that government should be based on clearly

23 written laws, consented to by those who will be governed by

24 them, and not on the predictable will of one man or even a few

25 men.

Opening Statement - Plaintiff

1      If you're watching politics and news, you know who the

2  lawmakers are and what the general idea was that we are

3  governed by laws.  This means that the laws -- when the laws

4  are broken, you look at written laws.  Here, Barry was wronged,

5  and he's here today asking you to base your verdict, after you

6  hear all the evidence, purely on the law and the facts that

7  were provided to you from day one.

8      The evidence will show that Paula and Barry were

9  married in June -- June 21, 1970.

10      So the evidence will also show almost 40 years

11  thereafter, Paula filed for divorce, May 23, 2011, in the state

12  court and in Cook County.  As stated, this is after 40 years'

13  marriage.  Although she filed for divorce on May 23, 2011, she

14  did remain in the marital home until, or through, November 27,

15  2013.

16      Together, Paula and Barry have only one child, one

17  daughter.  Her name is Brett Epstein.  Brett is -- Brett is --

18  I don't know exact age -- almost 40 years old now, and she

19  lives in England.  It is significant to mention that she is in

20  England for the evidence that will be provided to you when I

21  give you more details.

22      The evidence will show sometime, almost five years

23  prior to filing the divorce in two thousand -- prior to the

24  divorce in 2011, in 2006, Paula, unbeknownst to Barry, began

25  accessing his e-mail accounts without his consent, knowledge,

Opening Statement - Plaintiff

1    or authority.

2         I will show to you an exhibit that we have marked as

3    128.

4         MS. LANE:  Can --

5         THE COURT:  It's -- I believe it is connected to your

6    PC.  It should be.

7         MS. LANE:  I need Exhibit 128.

8    (Off-the-record discussion.)

9         THE COURT:  Like I told you earlier in the comments,

10   ladies and gentlemen, we never have trouble with the technology

11   here.  But once we get it worked out, usually it works pretty

12   smoothly.

13   (Off-the-record discussion.)

14        THE COURT:  All right, Ms. Lane.  It's up on the

15   screen for the jury now.

16        MS. LANE:  What you see on your screen is one of many

17   exhibits that you will see throughout this trial.  This e-mail,

18   when -- the part that I want to highlight to you, that Paula

19   accessed Barry's e-mail without his knowledge or consent, shows

20   this is an e-mail from Barry Epstein to another female who was

21   prior to this his mother's caregiver.  And this date is Friday,

22   August 12th, 2011, at 7:02 a.m.

23        And if you look in the body of that e-mail, it states,

24   "I am going out of town on two different trips over the next

25   ten days.  Best not to e-mail me until I return.  My e-mail is

1    definitely being compromised."

2        What this states is that he had no knowledge or idea

3    who was accessing or even a compromise.  The evidence will show

4    that he only believed this is an e-mail account from his Yahoo!

5    account, speaking about his work e-mail, not to send him

6    anything to his work e-mail address with the RNCO.

7        Trying to avoid that -- employers read your e-mails

8    sometimes.  It's best to not send private e-mails to your work

9    e-mails, trying to direct this to be cautioned.

10       But Barry never thought or knew that his e-mails were

11   being hacked by his wife in his own home for years.

12       The evidence will show that she snooped on her husband

13   because she could, because she had the access, she had the

14   opportunity.  And it -- she never confronted Barry that she was

15   actually snooping on him or reading his e-mails or even

16   forwarding his e-mails.  Later evidence will show even that

17   some e-mails or the headers were destroyed in the process.

18       I want to caution you not to be fooled by Paula

19   because the evidence will show that she's not your average

20   woman.  Paula is a very highly educated woman.  And the

21   evidence will show prior to her marriage in 1970, Paula had

22   already an associate's degree in radiology and technology.

23       After marrying -- after marrying Barry, they moved

24   together to West Virginia, where Barry was already a year as a

25   faculty in West Virginia, teaching in a university, which gave

Opening Statement - Plaintiff

1    the opportunity for his wife, as a faculty wife, to have

2    additional college, bachelor's degree completed.  It took her

3    two years to get a bachelor's degree.

4         And the evidence will show that in 1972, two years

5    after being married, she already finished her bachelor's degree

6    in sociology and psychology.  And this was free because she was

7    a faculty member thanks to her husband Barry at the time.

8         Evidence will show that in 19 -- in 1975, the couple

9    moved from West Virginia to Chicago.  And as soon as the couple

10   moved to Chicago, Paula continued her education, master's in

11   library science, her concentration in reference and technical

12   services.

13        I am going to show you what we have marked as her

14   résumé, 74.  Although the résumé that I have, or the CV,

15   however it's referred, is not in good writing or, for lack of

16   words, not very legible, this is all we have that we could --

17   that was produced to us during the discovery period in the

18   other proceedings.

19        Looking at this exhibit, Plaintiff's Trial Exhibit 74,

20   if you go to the second page of her education, you will see

21   that everything is listed here with her associate's degree

22   in -- from Truman College and 1977 reference and technical

23   services.  She also has West Liberty State College, where she

24   attended her bachelor's degree in psychology and sociology in

25   1972.

Opening Statement - Plaintiff

1      She also has listed here her other undergraduate

2   classes, but most importantly her M.A.L.S. -- and that's

3   master's in library science -- with concentration -- if any of

4   you known, when you go to a library, first person you go to is

5   the reference desk:  "Please help me how to find."  Everything

6   is under her fingertips.  She can show you how to do your fast

7   research, look up, and do your homework even quickly.

8      The very next year after '77, Paula became the head

9   librarian of Columbia College, of course, all of this with

10  encouragement of her husband, and support.  She began her

11  career in Columbia College as librarian.

12     Evidence will show that Paula began using e-mails

13  before anyone else.  As I stated before, the -- I will get to

14  it in detail later.  But some of us don't even know when the

15  e-mails came.  If you're young generation, you probably know

16  that this is going back to early -- late '70s, early '80s.

17     But the evidence will show, nonetheless, that she was

18  one of the first one using in 1980s when e-mail was still in

19  its infancy stage.  It was very early stages.  E-mails were

20  still in an old version where you had dial-up tones to access

21  your e-mails.  As a librarian, she had the full benefit of

22  being the first one to get her hands on e-mail accounts and the

23  history thereafter.

24     Evidence will show that she is very familiar and

25  comfortable with every aspect of e-mail, going back to her

Opening Statement - Plaintiff

1    employment as head librarian in Columbia College.

2            Evidence will also show that Paula was a career woman

3    who worked through her pregnancy with their first child.  She

4    worked through 1979 until her child was born.  And thereafter,

5    she took a brief break, seven month, to stay home to care for

6    her daughter before returning to work, even though it was

7    titled as a part-time, but library hours, it was close to

8    40 hours.

9            At the same time, being their first and only daughter,

10   Barry cared for Brett from infancy through high school,

11   including when Paula was working nights and Saturdays in -- at

12   her library position.

13           The evidence will show that Paula returned to

14   Columbia, this time labeled full time, not because she really

15   needed the money, because she chose to.  She loved her library

16   job.  And matter of fact, she didn't retire from Columbia

17   College until mid-2015, after 37 years with the library

18   services.

19           In fact, Paula is skilled in technology and has been

20   using computers in library since 1980s.  That also included --

21   if you look at the same exhibit, her job instructions included

22   teaching.  She also was an instructor teaching to incoming

23   students how to use the library services.  And she did this on

24   a daily basis.

25           The evidence will show after her daughter, Brett,

Opening Statement - Plaintiff

1    started college or finished high school in 1997, this career

2    woman started working two jobs.  She was working at the library

3    as librarian and also doing hospice care.  There were no

4    children in the house.  She had plenty of time.  So she was

5    either volunteering at first and then later converting it to

6    work.  But during her divorce she chose to go as volunteer

7    because she didn't want to get paid, showing an income during

8    the pendency of her divorce.

9            Evidence will show that Paula had been working with

10   e-mails about 20 years when she decided to start snooping on

11   Barry's e-mail account.  That's the first e-mail that we have

12   record of, going back to 2006.  The evidence will show in 2006,

13   without Barry's knowledge or consent, Paula accessed all

14   Barry's e-mails: the work e-mail with RNCO and Yahoo! and

15   att.net e-mail account.

16           The evidence will show she accessed his communications

17   with friends that he was communicating with: male, female.  The

18   evidence will show that she was accessing his e-mails with

19   family members, e-mail communications that Barry had with his

20   own mother prior to her death.  These communications were also

21   with Barry's business partners, business partners talking about

22   their daily days.

23           And you would not think that Paula would have a need

24   to know what is going on in husband's world.  For lack of

25   words, she could have asked for or communicated better instead

Opening Statement - Plaintiff

1    of snooping and reading these e-mails and either

2    auto-forwarding some of them or even forwarding them to her

3    other e-mail accounts just to read it, to know what was going

4    on at her husband's work.

5            She went so far to access communications with Barry's

6    attorneys.  The first e-mail communication was between Barry

7    and his trust-and-wills attorney.  He was intending to create a

8    trust.  This is a very highly confidential communication that

9    everybody knows, and there's always a notice of

10   confidentiality.  She was accessing these e-mails to see -- to

11   know what her husband was doing on a daily basis.  Instead of

12   confronting, she was just minding all of his business.

13           Evidence will show that she did this to gain control

14   over Barry, over Barry's accounts, lives, business, to gain

15   access over his entire life, which is abnormal behavior, to

16   snoop and go through every single e-mail and not even confront

17   that individual about those e-mails for wanting to give the

18   explanation what this might have been about.

19           The evidence will show that Barry had two offices and

20   four computers in the marital home in Kirkwood Drive.  These

21   were the computers that Barry used for his work.  As far as

22   Barry knew, Paula never used these.  At least she never used

23   these computers outside his presence, because there were times

24   when she would ask Barry, "Can I check my e-mail on these

25   computers?"  Barry would log out from his web server where he

Opening Statement - Plaintiff

1   accesses his e-mails and allow her to log in in her Internet

2   Explorer, check her e-mail.  She logs out; he logs back in.  So

3   he thought that was the brief times when she wanted to check

4   her e-mails in his presence.

5          There was never any such thing as shared computer in

6   Epstein home.  And the evidence will show that Barry used them

7   exclusively in the basement as his home office to conduct work.

8   At times, if she wanted to use it, it was with permission, but

9   it was not shared computers.

10         The evidence will show when Barry was not around --

11  that means he's also a businessman, working home, working

12  outside as a forensic accountant.  He travels a lot -- Paula

13  would sneak on Barry's computers when he was away so she could

14  look into his e-mail accounts, access them, read them, put a

15  rule in them, forward them to herself, to her work e-mail

16  address, to her other several e-mail address.

17         It was really hard -- the evidence will show it's

18  really hard to follow which e-mails were using for what, as she

19  had so many of them, to see what the purposes of these e-mail

20  accounts were.

21         The evidence will show that the parties had separate

22  e-mail accounts.  That means the parties did not share one

23  e-mail account with Barry and -- barryandpaula@yahoo.com.  They

24  didn't.  They had separate e-mail accounts.

25         They never shared the knowledge of the passwords of

Opening Statement - Plaintiff

1    any of these accounts with each other.  Barry didn't tell his

2    passwords to Paula; Paula didn't tell her passwords to Barry.

3    It was understood that this was one aspect that you should

4    preserve the privacy when you do your work or private agenda,

5    your e-mails.  And, therefore, the subject did not even come

6    up:  "Can I have your password?  Can I read your e-mails?"

7          And neither -- and the evidence will show that Paula

8    accessed at least three of Barry's password-protected e-mails.

9    Again, these e-mails are -- one is the work e-mail with RNCO,

10   and the other one is Yahoo!, and the other one is with att.net.

11         Generally, Barry accesses his accounts through a web

12   server on his computer.  If you are familiar with Outlook,

13   sometimes you have a mail client.  You have it saved and

14   populated on your desktop.  This was not the case.

15         Barry would go to the web browser on his computer and

16   put in the information, yahoo.com, and he would access his

17   e-mails from there, read them.  When he's finished, he logs out

18   and closes his entire web browser.

19         Barry will testify that he never saved any of his

20   e-mails on the computer.  He expected that his e-mails were

21   private.  And he had protectable right over this work or

22   personal e-mail accounts.

23         The evidence will show that Paula had her own e-mail

24   accounts, and Barry would treat this as private and believe

25   that Paula also represent -- or respected his privacy in

Opening Statement - Plaintiff

1    return.

2          The evidence will show that parties never talked about

3    accessing each other's e-mail accounts.  This topic never came,

4    never asked, all while during this almost a decade, from 2006

5    all the way she moved out 2013, she was checking every single

6    e-mail account, knowing everything about it, without once

7    having a confrontation and telling or confronting Barry, "I'm

8    reading your e-mail.  Explain this."  She never had this

9    conversation with Barry.

10         And as the passwords were never exchanged and she

11   never had the permission for these accounts, her conduct,

12   therefore, was illegal.

13         The evidence will show that in Epstein home, this was

14   their normal practice:  You have your e-mail accounts; I have

15   my e-mail accounts.  We appreciate and respect each other's

16   privacy.

17         The evidence will show that Paula intentionally

18   accessed all Barry's accounts and conducted whatever business

19   she wanted to conduct.  Then she covered her tracks.  One way

20   that she did was changing during this process of forwarding the

21   what some refer to as metadata -- the header, the original

22   messages -- by repopulating, resending, destroying the evidence

23   that otherwise would indicate what exactly happened, how these

24   e-mails were stolen from one account to another.

25         Her conduct was sneaky and deliberate and with malice.

Opening Statement - Plaintiff

1      Paula waited until Barry was out of the room.  The

2  evidence will show that she never checked these e-mails or her

3  own e-mails when -- she never checked his e-mails when he was

4  present in the room.

5      Other times, Barry was on a business trip.  He

6  traveled a lot.  She waited till he was out of the state, out

7  of the country before accessing all his e-mails when he's miles

8  away, still following the e-mail communications between Barry

9  and several third parties.

10      She then deleted the sent e-mails, after she forwarded

11  those e-mails to herself, to hide her track because the

12  evidence will show normally when you forward an e-mail from one

13  account to another account, you will have a copy of that

14  forwarded e-mail in your sent box.

15      The evidence will show that she deliberately covered

16  her traces by deleting all of these e-mails but four -- but

17  five.  Five e-mails were discovered during the -- this trial in

18  the discovery period.

19      Because she deleted these e-mails, she knew she didn't

20  want to be detected, and she didn't want to get Barry's

21  attention or have him suspect any wrongdoing on her behalf or

22  that she has done.

23      Evidence will show that Paula sent these e-mails

24  first, or at least started with, sending it to her Columbia

25  work e-mail so that she could access it when she was at work

Opening Statement - Plaintiff

1   all day long.  And then from there, she would put it from her

2   work computer, work e-mail, to her private e-mails again and

3   again.

4          She would store these e-mails so she could read them

5   later as a novel or for reasons unknown.  The evidence will

6   show she compiled all this evidence in her multiple e-mails.

7          In some of them, she wrote notes to herself when

8   forwarding these e-mails in the headers, making pointers about

9   a place, about a date.  So she altered these e-mails when she

10  was accessing and forwarding.  To jog her own memory, she

11  altered the subject lines.  She altered the body of the text

12  just to jog her memory, keep a log so she could use this

13  compiled evidence later on.

14         She intentionally did all these act.  She altered

15  these headers and then cataloged them as a librarian's language

16  would be in an order and to use these against Barry later on,

17  accumulating what she deemed to be evidence against her husband

18  Barry.  In the same process, she intentionally deleted the

19  original metadata of most -- almost all e-mails.

20         Paula did this for six years, intentionally.  Six

21  years.  The evidence will show that Paula took over 200 of

22  Barry's e-mails with other third parties, covering topics

23  unimaginable.  The evidence will show that Paula -- these

24  conversations were between very intimate family relations:

25  brother and sister, mother and son, his own daughter and

Opening Statement - Plaintiff

himself, attorneys, business partners, and also employees.

These information was under her fingertips. She could do whatever she wanted to do and collect evidence which she deemed useful to her to lead her or gain her some control over Barry's life.

Eventually Paula forwarded Barry's e-mails to other of her other e-mails, which she again preserved to be used later. These e-mails you will see again and again, too many of them with Gmail and Yahoo! and colum.edu.

The evidence will show on the Wiretap Act that -- to show your damages, you have to prove that somebody inserted a rule. The rule, the language means it's actually auto-forward. And the evidence will show that she was sophisticated enough to set up this auto-forwarding rule. She caused some or all of Barry's e-mails automatically to be copied to her. And then once in her inbox, she would forward them to her other e-mail accounts.

And evidence will show that one can set up this auto-forward rule from remote places even. You can put your auto-forward rule today and remove it tonight. You can leave it for one month. You can remove it two months later, a year later. And you cannot detect that.

You cannot detect that because you have to be sophisticated enough to do all these things without having the other person suspect your conduct. The evidence will show that

Opening Statement - Plaintiff

 1    she covered these tracks very well.

 2            The evidence will show that she deleted some of her

 3    own versions of the original forwarded e-mails which would have

 4    shown the auto-forward rule.  She destroyed the evidence to

 5    hide the auto-forwarding part.

 6            There is still -- evidence will show there is

 7    fortunately accidentally few e-mails left to suggest that there

 8    was, in fact, an auto-forward rule inserted in Barry's e-mail

 9    accounts.

10            The evidence will show that Paula had unfettered

11    access to his accounts through at least 2013.  This is when she

12    actually moved out from marital home.  She filed for divorce in

13    2011 yet remained almost two years in the marital home because

14    it was convenient to stay and keep on accessing his e-mails.

15    And you don't have to pay no rent; you stay free while you're

16    waiting to divorce him and while you're gathering evidence that

17    you think you could use against him prior to moving out.

18            She also had the opportunity to delete her traces of

19    this rule, of her other access.

20            Afterwards, when she moved out, she used all these

21    e-mails in the divorce proceedings against her husband to get

22    unfair advantage or get a higher settlement amount with showing

23    or attempting to use these e-mails to shame him, humiliate him,

24    to have him settle this case based on these illegally obtained

25    e-mails.

Opening Statement - Plaintiff

1    But as stated, she also was careless, and some of her

2  e-mails left traces of the auto-forwarding.

3    The evidence will show that Paula was content with

4  secretly monitoring Barry's activities for years.  But

5  everything changed in 2010, a year before filing for divorce.

6  In late 2010, Barry reached out to an estate planning attorney

7  to inquire into or about putting his assets in a trust to

8  manage them for Paula and reserve some of the money that he

9  made over the years to charities.

10    Evidence will show his plan for this trust was that if

11  he predeceased Paula, a trust would take -- make sure that

12  Paula was taken care of, and at the time of Paula's death, the

13  remainder of the assets -- this is only Barry's assets that he

14  accumulated during the marriage on his own accounts.  This was

15  not touching Paula's accumulated pension or Roth IRA or

16  401(k)s; it was only his.

17    That's the remainder he wanted after Paula was taken

18  care of, that the remainder would go to several charities of

19  Barry's choosing, including his alma maters.  He's a graduate

20  of DePaul.  He got a scholarship to get in there.  He is

21  grateful forever.  He also is a graduate from University of

22  Pittsburgh with his Ph.D.  So he felt, after taking care of

23  Paula, "The remainder should go to the charity of my choice."

24    None of Paula's separately maintained assets were to

25  be affected.  She would live off Barry's money without having

Opening Statement - Plaintiff

1    to use her own money, which would remain hers to distribute

2    according to her own wishes or wills.

3        The evidence will show she actually created a will

4    too, and she was encouraged by Barry to leave everything to

5    their only daughter.  He didn't need her money.  He wanted to

6    look out for them on top of what she had.

7        I will show you what we have marked as Plaintiff's

8    Exhibit 164.

9        Everything started changing in 2010 when Barry reached

10   out to his estate planning attorney.  This e-mail is a

11   follow-up e-mail from Barry's communications with the attorney,

12   just confirming their conversation in this e-mail.

13       This e-mail is from Barry, from his RNCO account,

14   which you cannot see here, but if you look on the top, at the

15   very top, where she entered into to forward it to herself, you

16   see how it's broken down to bepstein@rnco.com.

17       She forwarded this e-mail to herself on April 7, 2011.

18   This is one of the multiple e-mails that she forwarded to

19   herself.  And it says "Estate Planning," so there is no secret

20   about Barry's intentions.

21       This e-mail, again, is just a follow-up.  It says

22   Thursday, February 24, 2011.  Barry is writing to his estate

23   attorney, Mr. Bergman.

24       And this is what he states:  "Jeff, I was preparing to

25   execute an engagement letter when a few factors arose:  My

Opening Statement - Plaintiff

1   wife, Paula, has already recently prepared a will (with the

2   help of an attorney not of my acquaintance).  I wasn't aware

3   that she did this.  Her assets are minor compared to mine.  I

4   haven't seen her will but urged her to leave everything to our

5   daughter since I certainly wouldn't need any of her assets left

6   to me.  I understand that she has also prepared documents to

7   give me the power of medical attorney" --"medical needs.  Our

8   daughter lives in England and wouldn't be here to assist, in

9   any event."

10          Second paragraph is the most important:  "Thus, it

11  appears that my need for my firm's services is now limited to

12  the preparation of my own will and related documents.  My major

13  issue is to have Paula take care of in the event of my demise,

14  with the remainder going mostly to charities (perhaps with

15  majority portion going to charities immediately, leaving enough

16  for Paula's care and later final distribution to charities,

17  et cetera).

18          "I suspect a revised engagement letter is now needed."

19          This is one of the e-mails that changed Paula's entire

20  view on Barry's future intent of creating a trust.  She didn't

21  want Barry to create a trust because, the evidence will show,

22  if everyone has their own will, as she -- the evidence will

23  show she had her own will, leaving everything to whom she

24  wanted, a husband can have his will and he can leave to

25  whomever he wants.  As the wife, you can take your dowry,

Opening Statement - Plaintiff

1  right?  But Illinois respects the will that parties create

2  prior to their demise.

3       When Paula found out via snooping into Barry's e-mail

4  accounts that she would be losing control over Barry's assets

5  if he predeceased her, she investigated.  She instigated her

6  own daughter to talk Barry into making Brett, who is in

7  England, a trustee.  When Barry refused to accept this proposal

8  because Brett lives in England, Paula contacted her divorce

9  lawyer.

10       I will show you what we have marked as Exhibit 131.

11  This is an e-mail communication between Barry and their

12  daughter, Brett.

13       If you start looking from bottom up -- and later when

14  you do review this document, you can read it more in detail.

15  The subject line speaks of "Solved."  It appears there was a

16  question -- and this is a communication between father and

17  daughter which was forwarded to her mother to point out what

18  the father's intentions were with the will should he predecease

19  her.

20       THE COURT:  Ms. Lane, if there's part of this you're

21  going to refer to, you may want to magnify it a little bit.

22  I'm having a little trouble reading it, and I assume it's just

23  as tough for the jurors because some of this is pretty small

24  type.  It's your call, but if part of it you're going to

25  highlight, you may want to blow it up a little or magnify it if

Opening Statement - Plaintiff

1    possible.

2            MS. LANE:  I'm selfish.  I have mine.

3            THE COURT:  All right.

4            MS. LANE:  If you --

5            THE COURT:  All right.  That's better.  Well, it was.

6            MS. LANE:  If you look at this second page, from top,

7    from Exhibit -- Plaintiff's Exhibit 131 -- because the first

8    part says it was communication, December 12th.  If you go to

9    the e-mail communication before -- if you read page 2, the

10   e-mail dated Saturday, December 11, 2010, from

11   bjawaywithwords.se to barryjay_epstein@att.net, this shows to

12   you follow-up questions.  I'm trying to skip some things we can

13   leave for later.

14           But in the second paragraph or second -- second main

15   sentence, it starts with "What is a trustee?  Why is this

16   needed?  Isn't it a matter of leaving some money for Mommy that

17   she then manages herself as necessary, or is it more

18   complicated than that?  I'd be happy to help if I knew what to

19   do.  I think it's really good that you are looking into taking

20   care of her if the worst should happen.  And it's also really

21   good you are protecting yourself in regards to work.  You are

22   the most successful person at your firm, and you don't want

23   everyone else depending on you and using you, right?  So glad

24   you refused to get the loan.  You don't need it, and they all

25   owe you too much as it is.  You don't need the firm.  They need

1    you and rely on you way too much.  You could go out on your own

2    easily.  You could even set out your shingle and work from home

3    or from small office, don't you think?  You have plenty of

4    work, and you have your ladies who'd go with you.  This week

5    will be the last week of the term.  I've got 60 final

6    essays" --

7              I will skip the rest.  If you go one above that, on

8    November 12 -- I may be confusing it because Europeans have a

9    different --

10             MR. SCHAEFERS:  Your Honor, I do object to her reading

11   the e-mails in their entirety, front and back.  I believe it's

12   a waste of time.

13             THE COURT:  It's opening statement.  She's entitled to

14   make her opening statement, so objection is overruled.

15             Proceed.

16             MS. LANE:  Thank you.

17             The e-mail above, it could be November 12 or

18   December 11 -- I'm not very certain -- in 2010.

19             Barry writes to his daughter:  "A trustee is needed to

20   handle the trust that will pay Mommy all her living costs,

21   et cetera, while keeping the principal balance, which she could

22   use if needed, although the earnings would provide a high

23   standard of living, higher than we enjoy now, for final

24   distribution according to my wishes.  If I gave the money

25   outright to her, she could spend it and/or leave it to her

Opening Statement - Plaintiff

1   designees, regardless of my wishes.

2              "Since I earned it, I will decide how and where it

3   goes.  Thank you.  She will have the same option with her

4   money, which she can give away entirely since I will take care

5   of her.  Of course, no one knows who goes first."

6              And the e-mail is clearly talking about this is the

7   time Father's preparing for the worst and starting to create a

8   trust to look out for everybody in case something bad should

9   happen to him.

10             And there is follow-up communication December 12th

11  from her daughter, on Sunday.  And she states:  "What do you

12  want to do with your money?  I assume you want to give more to

13  DePaul.  Perhaps Pitt too?  Or something else entirely?

14             "If you tell me how you want to handle things, I'm

15  happy to do whatever you ask.  I would love to be of some use

16  to you since that's never yet been the case.

17             "I think it's important to ensure that you and Mommy

18  have some money for whatever your living costs and other needs

19  might be, and then, beyond that, giving money to charity or

20  whatever organization you deem appropriate sounds like a

21  generous plan."

22             And Barry responded, because the daughter is in long

23  distance in England, to finalize that, he said on

24  December 12th:  "To clarify, I don't need anyone to assist me

25  in 'ensuring that I have money for whatever my living costs and

Opening Statement - Plaintiff

1    other needs' as I will do that for myself, and any trust

2    arrangement would only be actuated upon my demise.  It would be

3    to take care of Mommy in my absence.  That is the sole purpose.

4        "I hadn't considered you a candidate for trustee for

5    two reasons: lack of proximity and apparent lack of interest in

6    serious money issues or business in general, notwithstanding

7    your cottage industry doing translation.  I know you are smart

8    enough, but assuming your ma outlives me (not a foregone

9    conclusion), there could come a time when she has sudden

10   financial needs that someone far away might not be able to

11   respond to with appropriate alacrity."

12       So this was the e-mail that changed everything for

13   Paula.  She immediately searched for a divorce lawyer to stop

14   this good deed of her husband.  Unbeknownst to Barry, Paula

15   continued to monitor his e-mails to see how far in his creation

16   of the trust he was going to go.

17       Now that Paula had a purpose in accessing his e-mails,

18   no longer was she monitoring his activities; she was getting

19   information for the divorce.  The evidence will show she spied

20   on Barry to gain an upper hand in the divorce proceeding and

21   get a step ahead of him.

22       Evidence will show she began reading his attorney-

23   client e-mails.

24       (Counsel conferring.)

25       MS. LANE:  Barry contacted a divorce lawyer, Azita law

Opening Statement - Plaintiff

1  firm, after he was contacted that the wife is seeking a

2  divorce.

3          The very first e-mail, which the evidence will show

4  was consultation with this divorce lawyer, Paula took that

5  e-mail and she was one step ahead of him, knowing who he had

6  hired to compete with her attorney.

7          After that communication, consultation communication,

8  several more e-mails were intruded upon and forwarded.  These

9  were attorney-client privileged e-mails about financial

10  discovery papers, handwritten and circled bank statements.  She

11  had them all so she could help her attorney to have the

12  advantages to get maybe more settlement out of her husband in

13  this matter.

14          The evidence will show when there were financial

15  disputes in the divorce, she would look into his confidential

16  e-mails with employers and business partners, and there were

17  numerous of them: partners talking about daily businesses, how

18  their business is doing, what the K-1 schedule is going to

19  show.

20          The e-mails themselves had all confidential notices.

21  By forwarding them, she did not only ignore these confidential

22  notices; she removed them, she cleaned them before she

23  forwarded them to her many e-mail accounts.

24          The divorce dragged on for years from 2011.  As a

25  matter of fact, as divorce of August 2016, the financial part

1    is still unresolved, and it's still ongoing.

2           In late 2013, Barry tried to settle with Paula.  He

3    offered Paula a reasonable amount, which she refused because

4    this was not enough.  This was she could keep all the money she

5    had, all the TIAA account, which at that time was already in

6    excess of a million dollars, not to mention her Social Security

7    benefit that she could have taken at age 62 or 65, which she on

8    purpose did not take until the divorce was final so she could

9    tell the divorce lawyer or divorce court, "Poor me.  I don't

10   have no income.  Therefore, I need money."

11          She didn't draw her Social Security benefits.  She

12   didn't touch her TIAA-CREF from college, Columbia College,

13   which was ready to be used, in excess of million dollars, which

14   her husband helped her during their marriage to set aside as

15   much as you can set aside tax-free.  She put everything in

16   because she didn't have no other expenses as for rent or food

17   or utility.  She saved that money.

18          Barry offered her a million and a half on top of what

19   she had, but she refused.  That was not enough.  She wanted

20   more.

21          In 2014, Paula dug back into her store of e-mails that

22   she had taken from Barry over the years.  She took old e-mails

23   between Barry and his friends, coworkers, his mother, his

24   mother's caregiver, and alleged extramarital affairs or

25   relationship so she could use this in her divorce proceeding to

Opening Statement - Plaintiff

1    threaten or attempt to threat or embarrass or humiliate to

2    force him to settle by giving her larger amount than she would

3    have gotten under normal circumstances.

4         The evidence will show she dragged these women into

5    the divorce to try to humiliate not only Barry, but also those

6    women that were colleagues from years ago or some acquaintance

7    at the time, to embarrass Barry publicly in order to pressure

8    him into disproportionate settlement.  She wanted it all.

9         The evidence will show that several women were named

10   as witness on the witness list in the divorce, although the

11   state says that this divorce access, party's fault does not

12   take a factor in property division.  She knows that, other than

13   you can embarrass, humiliate, and force him to give you.

14        Knowing fault plays no role in property division, she

15   used these individuals' names in the trial witness list, naming

16   them, that they will come to testify to embarrass and humiliate

17   him publicly.

18        And, in fact, Paula subpoenaed one of the women that

19   Barry was working 30 years prior to, which he kept on

20   communication with, for working either in the same building or

21   for whatever reasons.  They wanted to depose that woman.  They

22   sent a notice of deposition to prepare for trial.

23        These individuals -- so even -- even by trying to or

24   attempting to show that they were going to depose one of these

25   individuals to strong-arm him into giving her most of the

Opening Statement - Plaintiff

1     marital assets through the threat of embarrassment.

2           On October 24, 2014, Paula's counsel revealed the

3     stolen e-mails, these purloined e-mails that were stolen from

4     Barry's multiple accounts, and provided them to Barry's counsel

5     as evidence what they had in store for the trial.

6           This is the first time Barry ever knew, or had

7     evidence of, that his e-mails were being hijacked, hacked,

8     stolen.  This was the first time, October 25, 2014, when

9     Paula's counsel provided these stolen e-mails to Barry's

10    counsel that everything exploded.

11          These stolen documents were produced allegedly

12    response to Barry's counsel's demand in preparation of the

13    trial.  As there is no surprise, you're supposed to provide to

14    the other side what evidence you're going to provide at trial,

15    which is the routine.

16          None of the discovery ever includes stolen or criminal

17    act to bring into a divorce proceeding.  As a matter of fact,

18    this is illegal act.  It's never admitted in a divorce

19    proceeding, in any proceedings.  You cannot bring the fruits of

20    poisonous trees into the law to get what you want.

21          In any event, only preceded her counsel's use in

22    deposition by few -- few days' time.  Within three days finding

23    this out, Barry filed lawsuit against Paula and Paula's divorce

24    lawyer for sharing these stolen e-mails with Barry's counsel.

25          When Barry saw those e-mails for the first time,

Opening Statement - Plaintiff

1   October 25, 2014, he was shocked.  He felt violated.  He was

2   shaken to his very core by this violation of his privacy by

3   someone he thought he could trust in their own home to respect

4   each other's privacy.

5           He saw that Paula has taken his e-mails for almost a

6   decade.  What a shock to find out that you didn't even know

7   about it.

8           The evidence will show that these e-mails -- a divorce

9   is hard, but finding out this fact caused Barry sleepless

10  nights, anxiety, and pain.  He lost appetite.  He couldn't

11  sleep.  He was crushed by this revelation.  He hasn't been the

12  same ever since.  This is someone you shared your life with for

13  so many years.  All of a sudden, comes tumbling down to you as

14  a wake-up call.

15          He was so shocked and felt so violated that he filed

16  on October 27, 2014, this lawsuit.

17          Barry is seeking for his pain and suffering, among

18  other damages, punitive damages.  And the evidence will show

19  that it's his -- under the statute, there is a provision that

20  he can recover not only actual damages, but also punitive

21  damages to avoid this ever happening to another person, to

22  deter another person doing the same act.

23          Barry's lawsuit, Count I, as Judge Durkin already

24  stated, is on the wiretap.  On the Wiretap Act, Barry has the

25  burden of proof to show by preponderance of evidence that Paula

Opening Statement - Plaintiff

has set a forwarding rule to forward these e-mails to her other e-mails.

Paula -- Paula's e-mails will show that some of the e-mails have no recipient information. Does that mean that e-mails got somehow in her box but not via forwarding because it does not have the forward sign?

When the evidence comes to you in the form of the exhibits and you are examining these exhibits, you're looking at the subject line to see if there is a forward, which shows clearly you're accessing somebody's e-mails and then pressing the forward button, and it shows "Forward" in the subject line.

There are e-mails that will have no forward sign. It just landed in her e-mail account. How but for a rule that simultaneously carries it to the other side?

Barry -- second count is under Stored Communication Act. Stored communication, to put simply, there is a forwarding mechanism. The evidence will show these are the e-mails, when you look at the subject line, will have the forwards.

The defense will argue that these e-mails could have been forwarded by Barry to Paula. However, when there was ever a forward between Barry and Paula, there would be at least a text with it that indicates that this was actually forwarded.

But the evidence will show none of these evidence we are going to provide to you was forwarded from Barry to Paula.

Opening Statement - Plaintiff

1    These were all over the years taken, one by one, from one

2    e-mail to another e-mail and forwarded again and again.  Some

3    you will see this larger sign, and some you will see the

4    forwarding sign.

5              That's what Count II, stored communication, is about.

6              And the evidence will show that Paula has those

7    e-mails, clear and concise, that it was forwarded.  And it was

8    forwarded manually.  That will suffice the Count II.

9              Although when you look at the forwarding e-mails,

10   sometimes forwarded e-mails were forwarded again and again,

11   sometimes a minute apart, sometimes an hour apart, a week

12   apart, sometimes years apart.

13             The evidence will show some of those e-mails were

14   cleaned up for whatever purpose: to hide the traces, the crime,

15   or for whatever reason.  You will see e-mails that is not an

16   original e-mail.  Some you will find original forwards.

17             Barry's Count III is for unreasonable intrusion upon

18   seclusion.

19             You will find, after hearing all the evidence, Paula

20   is accountable for her meddling in Barry's e-mails behind his

21   back.  You will find that this was intentional act without his

22   authorization.  Shocking to everyone, especially if the purpose

23   of intrusion was to extort higher share of marital assets, to

24   stop and stay his intent to create a trust so he could help

25   other individuals who are in more need, his charitable

Opening Statement - Plaintiff

1    organization.

2             When you find this is a malicious intrusion of Barry's

3    trying to create a trust, selflessly looking out for Paula, the

4    remainder to poor people outside was to stay and stall this

5    conduct by attempting to shame and embarrass Barry.

6             They wanted all his money because whatever he offered

7    was not good enough because they thought they have some e-mails

8    there that any person would forgo and settle instead of being

9    embarrassed and humiliated publicly.

10            This alone was a direct and proximate cause of this

11   lawsuit, and Barry's claims are for mental anguish.  Barry is

12   seeking, among other damages, as a result of Paula's conduct

13   punitive damages.

14            Count IV is for intentional infliction of emotional

15   distress.  After seeing all the evidence, you will see that

16   Paula's intentional access of all Barry's e-mail accounts,

17   sharing them with her divorce lawyer to obtain unfair financial

18   settlement in divorce court, was an extortion.  It was extreme

19   and outrageous, causing Barry severe emotional distress.

20            Yes, Barry is seeking damages other than actual

21   damages.  He wants punitive damages because this should not

22   happen to anyone as it happened to him.

23            With regards to his Count V, which is trespass to

24   chattel, the evidence will show that Paula's intentional

25   interference with Barry's property, which are his e-mails,

Opening Statement - Plaintiff

1    these purloined e-mails, that was his property that was taken

2    from him, which was unconscionable act to extort from Barry his

3    hard-earned money so that he could not share it with charitable

4    organizations, which he did since 1969 prior to marrying Paula.

5           The evidence will show that Barry, throughout his

6    life, when he had little, he gave little; when he had more, he

7    gave more.  Throughout his life and marriage, with Paula's

8    knowledge and encouragement, he gave to charities.

9           Ladies and gentlemen, after you have heard the

10   testimony of the witnesses, expert witnesses and the parties,

11   and seen the presented evidence to you, or the circumstantial

12   evidence, you will find for plaintiff, Barry, because you will

13   tell defendant that nobody is above the law.  And you must find

14   Paula accountable on all counts.

15          "When every man lives without the law, every man lives

16   without freedom."  That was said by Pope Benedict.

17          We are not in a third-world country.  Thank God we are

18   still in the United States of America where we do have laws and

19   we do enforce laws.  And we thank God for that, that we have

20   laws to protect and serve us.  Without law and order, you

21   wouldn't have no human life on earth that would interact the

22   way they're supposed to.

23          The defendant, of course, will try to confuse you or

24   try to address your sentiment and your emotions by showing you

25   emotionally charged e-mails, e-mails on where it could mean

Opening Statement - Plaintiff

1    anything without corroboration.  It could be kind words; it

2    could be whatever.

3           But these e-mails are not -- the content of the

4    e-mails or the moral act or immoral act is not why you are here

5    today to decide on this case.  You must keep in mind that you

6    don't lose sight of the forest.  As the saying goes, don't lose

7    sight -- don't -- you know exactly what I'm saying about.

8    Don't lose sight of the forest.

9           THE COURT:  Forest for the trees.

10          MS. LANE:  Thank you.  I said that once, didn't I,

11   your Honor.

12          MR. SCHAEFERS:  No objection.

13          MS. LANE:  Don't lose the sight.

14          THE COURT:  All right.

15          MS. LANE:  I hope we can have little fun on this side

16   here.

17          Keep in mind, keep focus, the main issue here is those

18   counts that this case was brought under and the facts that you

19   will be deciding.

20          Barry will have proven his burden, and he will show

21   every element of his claims by preponderance of evidence

22   against Paula.

23          When you have seen all the evidence, you will want to

24   put yourself in the situation:  What if this happened to you?

25          Ladies and gentlemen, I know you will do the right

Opening Statement - Plaintiff

1    thing when you heard and seen all the evidence, when it's

2    presented to you.  Thank you.

3          THE COURT:  All right.  Thank you, Ms. Lane.

4          We're going to take our afternoon break right now for

5    about 15 minutes, give you a chance to stretch.

6          When you come back, we'll hear defense opening

7    statement.  Talk among yourselves about what time you want to

8    break today, whether you want to break -- I know none of you

9    woke up this morning thinking you'd be here this afternoon

10   hearing opening statements.  So if you want to break a little

11   early today, for instance, after the defense opening statement,

12   just let Ms. Newland know what time you'd like to break today,

13   and we'll try and honor that.  Thank you.

14         Please don't discuss the case among yourselves or with

15   anyone else.  Keep an open mind.  There's another statement to

16   hear and evidence to hear.  So ...

17         THE CLERK:  All rise.

18         THE COURT:  And you can leave your notebooks there if

19   you'd like.

20       (Jury out at 3:12 p.m.)

21         THE COURT:  All right.  How long do you expect your

22   opening to be?

23         MR. SCHAEFERS:  Half hour.

24         THE COURT:  Okay.  Well, Ms. Lane thought so too, and

25   it was an hour and 15 minutes.  So ...

1          MS. LANE:  Was I really?

2          THE COURT:  You were.

3          MR. SCHAEFERS:  11-page outline.  It's 14-point font.

4          THE COURT:  No time limits.  I'm not -- it's not

5     criticism.  I'm just saying if we go deep into the afternoon,

6     by about 4:15, 4:20, I'm not going to start a witness that

7     late.  We'll let the people go home, get a good night's sleep,

8     and we'll start up tomorrow morning with the first witness.

9          But let's see how much time is left after your opening

10    is done.

11         MR. SCHAEFERS:  Your Honor, can I ask something?  I --

12    we can stay off the record, if that's all right, for one

13    minute.  If you want to go on, that's all right.

14         THE COURT:  Off the record.

15      (Off-the-record discussion.)

16         THE COURT:  All right.  We'll see you back in

17    15 minutes.

18         MR. SCHAEFERS:  Thanks, Judge.

19         MS. LANE:  Thank you, Judge.

20      (Recess at 3:14 p.m., until 3:29 p.m.)

21         THE CLERK:  All rise.

22      (Jury in at 3:30 p.m.)

23         MS. LANE:  Your Honor.

24         THE CLERK:  For him?

25         MS. LANE:  Yeah.  He already has the exhibit list.

1          THE COURT:  Okay.

2          MS. LANE:  IT says this copy is good too.

3          THE COURT:  All right.  Very good.  Thank you.

4          All right, ladies and gentlemen.  Please be seated.

5          I understand you want to leave after the defense

6     opening, and we'll do that.

7          So, Mr. Schaefers, keep in mind that the longer you

8     go, the longer you're keeping the jury from their train.

9          MR. SCHAEFERS:  Ticktock, ticktock, ticktock.

10          THE COURT:  Secondly, I understand too that when you

11     see exhibits up on the screen, you'd like them expanded.  We'll

12     do our best to do that.  I think Ms. Lane, when she puts

13     witnesses on, will do that.

14          She had a little bit of technical difficulty, not

15     through fault of them but through the court process, so we had

16     to set her up on the side, and I think that limited their

17     ability to expand the e-mails.  That should be fixed tomorrow.

18     So when she puts witnesses on the stand, we'll make sure to

19     expand it.

20          If you can't see it or it's difficult, just raise your

21     hand.  We'll make sure it gets blown up.  I get the same view

22     you do, so if I'm having trouble, I'm assuming you are also.

23          All right.  Mr. Schaefers, you may begin with your

24     opening.

25          MR. SCHAEFERS:  Thank you, your Honor.

Opening Statement - Defense

1          OPENING STATEMENT ON BEHALF OF THE DEFENSE

2          MR. SCHAEFERS:  May it please the Court, Counsel,

3    Mrs. Epstein, ladies and gentlemen.

4          Your Honor, can you flip on the exhibit screen for the

5    jury?

6          THE COURT:  Sure.

7          MR. SCHAEFERS:  Ladies and gentlemen, you heard

8    plaintiff's side of the story.  Now let's hear what the

9    evidence will actually show.  Let's hear what the truth is to

10   this case.

11         This case is nothing more than plaintiff's vendetta,

12   his vendetta against his ex-wife for daring to divorce him

13   because she saw e-mails on her shared home computer between him

14   and three women he was having affairs with.  That's -- she

15   divorced him for that, and he wants to punish her now.

16         He knew all along.  He knew all along that she had

17   seen his e-mails with these other women.  From October of 2008

18   through March of 2012 when she stopped accessing them -- she

19   was in divorce for a year.  She no longer had any interest in

20   seeing what kind of side things he had going on.  He knew all

21   along.

22         But he didn't care.  He didn't care until the divorce

23   court was about to split up his precious money with her.

24   That's what this case is about.

25         I'm going to show you a bunch of e-mails.  Note that

Opening Statement - Defense

1   plaintiff's counsel didn't show you any.  One, maybe.  I'll

2   show you a bunch of e-mails between him and the other women

3   that Paula saw, forwarded to herself.  She forwarded them to

4   herself because she was in shock.  She was devastated.  She was

5   in emotional turmoil.  She couldn't believe it, that he was

6   doing this to her again.

7           What do I mean "again"?  He had done this to her in

8   the 1980s with Janice Sandala.

9           Let me give you the three names of the ladies that

10  plaintiff's attorney didn't bother to give you.  Janice

11  Sandala, Rose Vivian Harayo.  She also has her -- goes by her

12  maiden name, Rosario Pabualan.  Call her Rose.  All right?

13  Janet Geovanis is the third one.

14          He had affairs with all of them.  He's not going to be

15  able to deny it, at least not believably.  She saw that.  She

16  said, "You know what?  I've had it.  I've got to get away from

17  this man.  It's toxic.  I can't live like this.  I'm divorcing

18  him, and that's it."

19          Well, when he asked for the documents in the

20  divorce -- she didn't use them in the divorce.  She didn't tell

21  anybody about it.  She gave them to her attorney just because

22  Ms. Lane in the divorce case had asked for them:  "Give me any

23  evidence you have of infidelity."

24          So she gave them to her attorney.  The attorney gave

25  them to Ms. Lane.  Three days later, he sues her in federal

1    court, which is what you're doing here today.  He sued her

2    because how dare she divorce him for his infidelity.  All

3    right?

4           The fact that he knew about it from October of 2008

5    right up through March of 2012, through October '14 when he

6    filed suit, that's relevant because he's too late in bringing

7    this case.  There are short statute of limitations for this

8    kind of thing: two years under Counts I, II, and IV.  He waited

9    three and a half and in some cases six and a half, for some of

10   the e-mails six and a half.

11          Statute of limitations, he was on notice.  He knew

12   that it was going on, didn't care.  But once he -- once he

13   finally got these e-mails in hand, he said, "You know what?

14   She's going down."

15          He's the one that got the unfair financial advantage

16   in the divorce case.  He's the one trying to seek to extort her

17   with this lawsuit.  I'll show you an e-mail to prove it.

18   December of 2016.  We'll get back to that in a minute.  He's

19   the one seeking an unfair financial advantage here.

20          All right.  So I gave you the three women's names.

21   Let's take a look at some e-mails.  All right?

22          Well, before we look at the e-mails, let me make one

23   more point about his knowledge of her accessing his e-mails on

24   their shared home computers in accounts he left wide open.  He

25   knew that she used the computer for e-mails.  He knew that she

Opening Statement - Defense

1    looked at that computer, that she used it for e-mails, that he
2    used it for e-mails.
3            He left it wide open.  He didn't log out.  He left his
4    password on there.  She didn't know his password.  He doesn't
5    even know his password.  I'll show you his sworn written
6    response to prove it.
7            All right.  So since they didn't show you any e-mails
8    that she took, let me.  Janice Sandala.  Before we get into her
9    e-mails, let me tell you about his history with her.  Even he
10   admitted --
11           Exhibit 131.  Pull it up, please, page 3.
12           Even he admitted that back in the 1980s, Janice
13   Sandala went to Paula's workplace to confront her about -- just
14   to tell her about what was going on with her and Barry.
15           All right?  We're on page 3.  You see paragraph 7
16   right here.  I'm the one that's going to be making these colors
17   in case the -- is the coloring on right now?
18           THE COURT:  It should be, but you need to expand it if
19   you can.
20           MR. SCHAEFERS:  There we go.  Let's have green.  How
21   do I do green?
22           THE COURT:  Can you expand this at all?  Again, it's
23   the same problem we had with the other e-mails.
24           THE CLERK:  Are you able to see it?
25           THE COURT:  There.  That's better.  All right.

Opening Statement - Defense

1    MR. SCHAEFERS:  This is his sworn written response to

2  questions in this case, by the way.  I asked him questions

3  about when he told his wife about Janice.

4    His sworn written response, he said in the 1980s, he

5  was told about an alleged meeting between Paula and J.S.,

6  Janice Sandala, at Paula's workplace, in response to which he

7  was upset because certain allegations were made against him.

8    Well, tellingly, he didn't tell you what those

9  allegations were.  Paula's going to do that.  Paula's going to

10  get on the witness stand and tell you what that meeting was all

11  about.

12    She's going to say, "Janice came by, identified

13  herself as Barry's girlfriend.  Said, 'We've been on vacations

14  together.  Here's the pictures to prove it.'"

15    30 years ago.  We still don't get the pictures, but

16  she's going to say that's what happened:  "Here's the pictures

17  to prove it."

18    Brace yourself.  She said, "I know how to please him

19  sexually, and I can teach you if you want."  She's going to

20  tell you that under oath that's what she said.

21    And Janice would also call the house:  "Hey, Paula.

22  Can you go into Barry's car?  My earrings are in there.  My

23  panties are in there."

24    I'm telling you, this devastated Paula back then.  And

25  when she stumbled upon his e-mails with Janice in September of

Opening Statement - Defense

1    2007, when this all started -- when she stumbled upon them, she

2    was devastated.

3            That's why she kept accessing them, not to obtain some

4    kind of unfair financial advantage in any divorce, but because

5    she was devastated.  She couldn't believe that this man, to

6    whom she had devoted her entire life, loved him, provided a

7    daughter, provided him a home, made his home, could do this to

8    her again.  All right?

9            So the Exhibit 8, please.

10           This is one of the e-mails that Paula found between

11   Barry and Janice.

12           All right.  Scroll down.

13           All right.  This is number one, Barry to Janice.

14   "Busy all weekend?  Want to hang out?"

15           Saw that.

16           Exhibit 10.  Scroll down.

17           Okay.  "Didn't hear from you, so cancel Sunday idea."

18   He's e-mailing Janice.  He's disappointed she didn't accept his

19   invitation to go out on a date.  All right?

20           Exhibit 11.

21           May 16th, 2008, e-mail.  May 16th, 2008, Barry to

22   Janice.  He's talking about Jillian, Janice's niece, whom he

23   had hired at his accounting firm for the summer.  All right?

24           "She knows she got the job because of you, right?

25   What else does she know about you and me?"

Opening Statement - Defense

1        That's what he said to Janice.  Does she know that we

2    are involved in an extramarital relationship?  Yeah, he didn't

3    say that as much in that e-mail, but when you put everything in

4    context and you hear what Paula has to say about everything, it

5    couldn't be more clear.

6        Exhibit 13.  All the way down.  Little bit.  Okay.

7        Saturday, June 21st, 2008, Barry to Janice:  "I don't

8    know what your schedule is, so I am leaving you a welcome home

9    message to await you in case you check your e-mail."  All

10   right?

11       Scroll up.  Scroll up.

12       She says, "Yeah, I'll tell you all about my trip.

13   Here it is."

14       Then he says, "Sounds nice.  Welcome back."

15       Right here.  Scroll down -- scroll up.  Up, up, up,

16   up.

17       "Welcome back."  All right?

18       Exhibit 14.  All right.  Scroll down.  Okay.

19       Saturday, June 28th, Barry to Janice:  "Were you

20   looking for a date after your health club visit?  How about

21   Abbas?  Is that where you want to go?  But I'll ask the

22   birthday girl."  He's asking her out on a Saturday night date,

23   to go have dinner with her.

24       These are the e-mails Paula has seen, and that's not

25   all.

Opening Statement - Defense

1          Exhibit 15.

2          Now Barry was getting Janice's niece involved, Jillian

3   Sandala.  In and of itself, they're just talking about work.

4   Paula saw this and says, "Wait.  There's a niece now?  He's

5   hiring her niece?  What kind of relations?  They must be having

6   an affair.  I can't believe this is going on.  I can't believe

7   this is happening to me."

8          Exhibit 22.  All right.

9          So Paula finds out.  This is in September of 2007.

10  Not until October of 2008 does she actually confront him about

11  it.  Why did she wait a year, you might ask?  She's just not

12  that kind of person.  She's not confrontational.  She wants to

13  try to stick it out with her husband.  She's in shock.  She

14  can't believe this is going on.

15         So October 18th, 2008, she sends an e-mail to Barry.

16  All right?  Telling him she knows.  She knows about Janice.

17  "You like living on the edge.  Well, you cut me to the quick

18  with all your actions.  No damage control" -- you can read

19  it -- "you broke a moral and legal contract.  You broke my

20  heart.  Hope she was worth it."

21         Paula is putting Barry on clear notice that she had

22  accessed his e-mails.  He knows at this point that she had

23  accessed his e-mails.

24         Exhibit 23.  Scroll down.

25         Okay.  October 21st, three days later, 2008, Paula to

Opening Statement - Defense

1    Barry.  Right up here.  Do you see?

2         She wants Barry to end it:  "If you're going to talk

3    to these women again, I want to know about every word.  I want

4    to know about every meeting.  I want to know about every

5    e-mail.  I want to be on the call.  You did this to me before.

6    I'm not going to let you do this to me again."

7         He mentions Janice's name, Jillian's name.  These are

8    the women who he was e-mailing with.  He had to have known.  He

9    thinks he's a smart -- he is a smart guy.  I'll give him that.

10   Accomplished accountant, accomplished testifying expert.  He's

11   a smart guy.  He knows what's going on here.  He knows that she

12   had seen his e-mails.  And if he's going to get on the stand

13   and say he didn't know, he's insulting your intelligence.

14        Scroll down a little bit more, please, to the bottom.

15   All the way down.  Okay.  That's good.

16        The Segal Company, that's Janice's company.  That's on

17   her e-mails.  That's her e-mail signature -- part of her e-mail

18   signature block Paula copied and pasted into that e-mail.

19   Barry knows what her signature block is.  He knows what company

20   she works for.

21        Paula put him on clear notice that she had accessed

22   his e-mails with Janice Sandala.  He knew in October of 2008,

23   six and a half years before he filed suit, all this evidence is

24   going to show.

25        Exhibit 24.

Opening Statement - Defense

1      October 27th, 2008.  Scroll all the way down on this

2  one, please.  Go up a little bit.  Oh, stay right there.

3  Sorry.

4      Monday, October 27, 2008.  Barry says, "What's your

5  schedule?" in the subject line.

6      All right?  Paula's still hurt, still devastated,

7  still in shock, can't believe it.  Responds like this,

8  October 27, 2008:  "What gall.  What nerve.  You have time for

9  all these things.  You have time for Janice, you have time for

10  Jillian, but you don't have time for me.  You don't have any

11  interest or concern for my feelings."

12      He's using her -- she's using their names, the names

13  she got from e-mail.  He had to have known.  If he didn't, if

14  he's going to tell you that he didn't, he's insulting your

15  intelligence.  And you shouldn't buy it.

16      Exhibit 28.

17      A few months go by.  She's still hurt.

18      January 19th, 2009.  All right.  Paula to Barry.

19  Here's the date.  "Schedule an appointment.  Please schedule me

20  for an appointment this week."

21      Apparently that's how she had to talk to him because

22  he had no interest in talking about himself, talking about

23  their marriage, trying to make things work.

24      Angry, resentful, hurt, furious, callous.  "How could

25  you do this to me?  We have to work on this.  You have to talk

1  about it with me.  I need to get over this horrible chapter in
2  my life."
3          Here:  "I look at you and keep asking myself how could
4  you have done this to me.  Who knows, probably even continue to
5  do this to me or will once again do this to me."  Right here.
6  "You're going to do this to me again if we don't work this
7  out."
8          Well, unfortunately for Paula, that was perceptive
9  because probably in 2009-2010, that's when he takes up with
10  Rose.  Rose is his now late mother's caregiver that Paula hired
11  and Paula worked with to care for his dying mother.  All right?
12          Paula, beginning I believe it was in late March of
13  2011, she sees e-mails between Barry and Rose.  Barry and Rose.
14  Rose is sending him Valentine's greetings, pictures of herself:
15  "I love you, honey," singing him love songs over e-mails.
16          Paula sees this, and her heart dropped.  Her jaw
17  dropped.  Her heart dropped.  Her self-worth dropped.  She felt
18  like a failure.  She felt devastated.  That's why she was going
19  into these e-mails.  This is why she was looking at his e-mails
20  in her home on her computers.
21          He says they belong to him.  He knew that she used
22  them.  We have an e-mail from June 2009 to prove it.  She would
23  send e-mails from his computers.  His expert found that e-mail
24  on their shared home computers.
25          So when they say that his computers were his computers

Opening Statement - Defense

 1   and she wasn't allowed, you're not going to be able to buy it,

 2   and you shouldn't because it ain't true.  All right?

 3          Okay.  Now, when Paula -- the evidence will show when

 4   Paula saw these e-mails between Barry and Rose in late

 5   March/early April 2011, a lot of things made more sense.  A lot

 6   of things that were unusual in the past several months since

 7   his mother died made sense.

 8          Barry was paying a lot more attention to his mother.

 9   She was 94 --

10          MS. EPSTEIN:  Three.

11          MR. SCHAEFERS:  -- 93 years old when she died.  He had

12   hardly talked to her before Rose came into the picture.  When

13   Rose came into the picture, "Hey, I'm going over to my mom's

14   house.  Let me help out with this."

15          And Paula at the time is -- no offense -- as naive as

16   she was, thought, you know what?  That's nice of him.  What a

17   pleasant surprise that he's helping his mother kind of go into

18   her twilight with some attention from her son.  That's nice.

19   That's nice.

20          Another thing was a little strange and not so nice:

21   She gets a call from the caregiving service saying, "Can you

22   please tell Barry not to give Rose more money than the other

23   caregivers?"  What does that mean?  That was strange.  That was

24   strange to her, right?

25          And then after the mother died in August of -- July-

1   August 2010, Rose has a housewarm -- house -- open house at her

2   daughter's house, daughter's building on the Northwest Side.

3   Barry goes but doesn't take Paula.  At the time that was

4   strange.  That was strange.  The more money was strange.  The

5   more attention was strange.

6           But when she saw these e-mails, okay.  That -- now

7   that explains it.  Devastated, hurt.  That's why she accessed

8   the e-mails.  She didn't use them in the divorce for any kind

9   of financial settlement, any kind of unfair financial leverage.

10          She used them to remind herself, "I've got to get away

11  from this guy.  That's the final straw.  I've got to get away

12  from this guy.  No matter how hard it's going to be, no matter

13  how part of me might be drawn to him, might want to stay with

14  him, I've got to remind myself six months from now that this is

15  the kind of things he does to me.  This is the kind of guy that

16  I'm dealing with."

17          That's why she forwarded them to herself, made little

18  comments in the subject line, not because she had any malice

19  toward him, not because she intended to cause him any severe

20  emotional distress -- which is a joke of evidence in the -- but

21  we'll get back to that later -- but because she had to remind

22  herself it's a bad guy.

23          "50 years I've been with him.  I thought I knew him; I

24  don't.  Got to get away.  Don't have so many years left.  I

25  can't spend the rest of them with this guy."

Opening Statement - Defense

1    So let's see some of the e-mails that she found.

2    Well, before we get to the e-mails, Barry himself in

3    his sworn responses to those written questions -- we call them

4    interrogatories because us lawyers, we've got to have special

5    names for everything, right?

6    Exhibit 131.  Page 3.  Okay.

7    We're starting here where Rose starts: "R.P., Rosario

8    Pabualan."  Right?  One of her caregivers.  Paula liked to

9    invite friends.  Okay.  So you can read.  I'm not going to read

10   it.  I'm not going to waste your time.

11   Okay.  So R.P.'s husband took it upon himself to call

12   Paula, express his suspicions about the relationship between

13   Rose and plaintiff, asserting that it was more than it actually

14   was.

15   Plaintiff in a sworn document admitted that there were

16   suspicions, that there was a relationship, that there was a

17   confrontation.

18   So all of these things added up in Paula's mind:  "I

19   can't believe it.  I can't believe it.  You know, I've got to

20   get away from this guy.  I've got to remind myself in the

21   future that I can't stay with this guy.  And so that's why I'm

22   going to obtain his e-mails.  That's why I'm going to forward

23   them to myself."

24   Okay.  Exhibit 44.  Defendant's Exhibit 44.  Scroll

25   down.  Okay.  Just right here.

Opening Statement - Defense

1          Rose, February 10th, 2011, an e-mail to Barry.

2          Scroll up.

3          Paula had forwarded this from his account at home.

4    She was at home.  She was on their shared computers.  She

5    forwarded this from his account to hers on March 27th, 2011.

6    That's when she began finding out about this -- the thing with

7    Rose.  All right?

8          So bottom page, she sent him -- Rose sent Barry a

9    picture of her in front of a Christmas tree, and this is a copy

10   of the picture.

11         Can you get rid of that Dell command update on the

12   bottom of your computer?  There you go.

13         This is the picture that she sent.  Okay?  In and of

14   itself, maybe it's harmless.  They worked together.  She worked

15   for his mother.

16         Let's see some others.  Exhibit 48.  Scroll down.

17         Rose to Barry:  "Honey.  Happy Valentine's Day!!!  I'd

18   love to be with you ... if only I could ... it's me ... Rose."

19         He's going to tell you it was a '70s song, lyrics from

20   a '70s song that she's quoting to him.  Well, how many -- ask

21   yourselves how many other of the caregivers from the caregiving

22   service sent him song lyrics, love song lyrics, pictures of

23   herself in front of a Christmas tree, pictures with her family,

24   her granddaughter, her husband.  "It's me, Rose."

25         Exhibit 51.  Scroll down.  Okay.  Keep going down.

Opening Statement - Defense

1          What have we got here?  Okay.  So here's that same

2     e-mail again.

3          Scroll back up.

4          I'll show you Barry's response and why it's important.

5     There's the response, February 14th:  "The sweetest Rose,

6     indeed."  He's going to say he's a Shakespeare buff and that's

7     Shakespeare and it wasn't love.  All right?  Ask yourself

8     whether you're going to buy that.

9          So scroll up.

10         I'll let you know when Paula had accessed this.  She

11    sent it to herself March 27th, 2011.  All right?  From his

12    account to hers.

13         Exhibit 53.  Scroll down.

14         11 days after the Valentine's Day e-mail,

15    February 25th, 2011, Rose to Barry:  "I'm sending my love to

16    you, honey.  You're so wonderful.  I'm always thank God for

17    having you in my life.  Hope it will be forever."

18         So she's seeing these e-mails, and believe you me,

19    there's more.  Right?  Remember what he said about "The

20    sweetest Rose, indeed."  A few days after this --

21         Scroll back up, March 27th.

22         A few days after March 26th -- a few days after this,

23    they're sitting in their kitchen, Paula's going to tell you,

24    her and Barry.  She says, "You know what?  Who is this

25    'sweetest Rose' that you've been talking to?"

Opening Statement - Defense

1    The same language that she used -- that he used in the

2    e-mail:  "Who's 'The sweetest Rose'?"

3    And he says, "Hmm.  My Aunt Rose" is what he said --

4    is what she's going to say he said.  His Aunt Rose.

5    And she said, "Are you kidding me?  You don't even

6    like her."

7    And he says, "Well, okay, yeah."  And then he's deer

8    in headlights for the rest of the meeting.  He won't talk about

9    Rose.  He wants her to shut up and stop talking.

10   That's why she kept accessing his e-mails.  And by

11   showing him -- by asking him "Who is 'the sweetest Rose'?" --

12   he's a smart guy -- he knows that she had seen his e-mail to

13   her calling her "the sweetest Rose."

14   And so what did Paula do about it?  She not only

15   confronted him in the kitchen, not only, she'll testify, that

16   she kept asking him in person, but she sent him e-mails about

17   it too.

18   Exhibit 61.  Go ahead.  Back up.

19   Paula to Barry Monday.  She thanks him for checking on

20   Max.  I guess he went and visited her down in Arkansas --

21   Arizona, yeah.

22   "16 days ago I asked you who was Rose."  So that's --

23   18 minus 16 is April 2nd.  "Asked you who is Rose.  Who were

24   you talking to?  It's important to me, the fact that you had

25   even the nerve to lie to my face.  So is your continual lack of

Opening Statement - Defense

1    respect for me."

2            So she knows who Rose is.  She knows that he's having

3    an affair with him -- with her.  He knows that she had seen his

4    e-mails.

5            When plaintiff's attorney said he didn't know until

6    October 27th, 2014 -- well, strike that -- October 24th, 2014,

7    when she produced the e-mails in the divorce case, you got the

8    contrary proof right here.

9            Don't buy it.  Don't buy it when he's trying to sell

10   it.

11           Exhibit 63.  Scroll down.

12           Another e-mail along the same lines.  April 26th,

13   2011.  Paula to Barry -- to Barry.  This is at his AT&T

14   account:  "I asked you this morning to have a conversation

15   about Rose.  The fact that you can without a moment's

16   hesitation lie to me with such impunity should no longer be a

17   surprise to me.  I'll ask you this question every day.  Until

18   we talk about this, there's nothing to talk about.  Our

19   relationship is doomed."

20           He's telling her about Rose.  He's telling her the

21   information that she saw in the e-mail.

22           No, I'm going to ask her -- she'll be asked, "You

23   didn't tell Barry that you were accessing his e-mails, did

24   you?"

25           And she'll say, "No.  Not in so many words, no."

Opening Statement - Defense

1    Because she's not a stinking lawyer, right?  She's not

2    confrontational.  That's not how she operates.  That's not how

3    her marriage works to her.

4    So she didn't tell him in so many words, but she's

5    leaving clues and breadcrumbs all around that a smart guy like

6    him could reasonably discover.

7    "Reasonably discover" is in the statute of

8    limitations.  If he knew or had reasonable opportunity to

9    discover that she had accessed his e-mails with the three women

10   that he was having affairs with, that's what starts the clock

11   running.  And at the time he brought this suit, the clock had

12   run out.

13   Exhibit 68.  Scroll down.

14   Another e-mail, from her to Barry, May 18th, 2011:

15   "Barry, you're oblivious, devastation" -- everybody read it.

16   "You're oblivious to the devastation you have caused me.  You

17   said you didn't mean to hurt me.  Well, you sure did.  What

18   were you thinking?  My question to you is, what are you going

19   to do about it?  To constantly lie to me, deceive me, and have

20   a relationship with your mother's caregiver while she was

21   actively dying is just plain sickening."

22   He knew -- he knew it was Rose.  He knew she had seen

23   his e-mails with Rose.  The clock started running.

24   Now, the fact that he knew is also relevant not only

25   to the statute of limitations, but also to his consent.

Opening Statement - Defense

1    Married 46 years.  Same house, same computers.  You don't need

2    a password to log on to the computers.  He left his e-mails

3    wide open.  He knew that she had seen these e-mails with

4    Janice, with Rose.  He consented.

5         Did he say, "I consent?"  Did he say, "You have my

6    express permission?"  Perhaps not.  He's going to tell you he

7    didn't.  And Paula will probably say that he didn't say that

8    either.

9         But if you know that somebody is in your e-mails and

10   you don't do anything to stop it, if especially it's your wife

11   of 46 years who lives with you, who uses this computer, that's

12   consent.  That's implied consent.

13        Because there's a -- because there's consent, there's

14   no violation under the Wiretap Act, the Stored Communications

15   Act, or any of the three causes of action, Counts III through

16   V.

17        Now, you don't just have to take my word or Paula's

18   word for the fact that he knew Paula had accessed his e-mails.

19   If you don't want my word, you don't want Paula's word, take

20   Barry's word for it.

21        Exhibit 82.  This is the same -- it's Plaintiff's

22   Exhibit 128.  They're going to show you this e-mail too.  All

23   right?

24        R. Pabualan is Rose's maiden name.  Barry to her,

25   August 12th, 2011.  Here's her subject line:  "Hi, good

1   evening.  I'll be working over the weekend.  It's nice to hear

2   from you then."

3          "I'll call Saturday.  Don't send any more e-mails to

4   the office address," his RNCO address.  That was his

5   instruction to her about that address.

6          The next paragraph, this was his instruction to her

7   about his Yahoo! address:  "I'm going to be out of town.  Best

8   not to e-mail me until I return.  My e-mail is definitely being

9   compromised."

10         He's going to give you this half-baked excuse that,

11  hey, you know what?  I'm joining a firm in four months' time.

12  I hear they read their employees' e-mails, so don't e-mail me

13  there.  That's what he's going to say.  All right?

14         Well, then why would he care about his personal

15  account?  Paula had seen his e-mails, confronted him about it

16  umpteen times.  He knew his e-mails were compromised.  He knew

17  Paula had accessed them.  The clock started running, and he

18  didn't file this suit until long after it ran out.  And, again,

19  because he didn't care.  He might even have been proud of it.

20  She forgave him for Janice in the '80s.  She forgave him for

21  Janice in 2008, 2009, 2010.  He didn't care.

22         She -- she's not going to leave her -- she's not going

23  to leave him.  He didn't care.  Well, when she did leave him

24  and asked the divorce court to split up his precious money,

25  that's when he cared.

Opening Statement - Defense

1          All right.  Exhibit 122.

2          This e-mail is a good one for a number of reasons.

3     These black marks are stuff you don't need to see.  All right?

4     Court agrees, plaintiff agrees you don't need to see it.  All

5     right?

6          Okay.  Barry -- this is a -- note the date,

7     December 16, 2016.  Okay?  This is several years later.  This

8     is Barry's e-mail.

9          Why don't you scroll down and see all the -- what --

10    scroll down all the way just to see how long this e-mail is.

11         Rest assured, I'm not going to read it to you.

12         Okay.  The message here we'll let you read.  The

13    message here is "Hey, I've got this federal suit.  I'm going to

14    scorch the earth in that federal suit.  Guess what else?  I'm

15    going to call the FBI.  You're going to prison, lady."

16         His wife -- well, his now ex-wife at the time.  That's

17    what he's saying to her.  I'll show you.  First -- well, before

18    I do that, first:  "Years ago I explicitly told you about the

19    illegality of breaching legal communications" -- "electronic

20    communications."  Let me say that again:  "Years ago I

21    explicitly told you about the illegality of breaching

22    electronic communications."  "Years ago," right around the time

23    probably in August of 2011 when he told Rose Vivian, "Hey, my

24    e-mail's being compromised."

25         Again, the clock started running on the statute of

Opening Statement - Defense

1    limitations, and it shows he knew but he didn't care.  He knew.

2    He consented.  If you live with somebody, you leave the mail

3    out for years and years and years and you know that they're

4    opening it, you've consented.

5            Consent is a defense under the Wiretap Act, the Stored

6    Communications Act, the rest of the claims.  That's what that

7    means.

8            All right.  So scroll down a little bit.

9            We'll talk about the -- get back to the FBI and this

10   criminal thing.  Okay.

11           "AHNO -- pardon the French -- Asshole No. 1."  That's

12   how he refers to her divorce attorney, Paula's divorce

13   attorney.  He's a 16-year-old trapped in a 70-year-old's body.

14           Okay.  "And in the upcoming federal trial and any

15   criminal actions to be brought by the FBI, which I will be

16   immediately reinvigorating" -- he's calling the cops on her.

17   All right?

18           Scroll down all the way to the end.  Okay.  Okay.

19   Scroll back up.

20           Let's see here.  "You will likely" -- "Third, you will

21   likely face criminal investigation and defense costs and may be

22   well found liable for money penalties and even jail time.  The

23   FBI will find this impossible to ignore."

24           Who is seeking the unfair financial advantage here?

25           Scroll down.

1      He's doing this because he wants her to accept -- I

2  don't know -- a third of the marital estate tops.  Probably

3  could get half from the divorce.  He wants her to accept a

4  third.  He's the extortionist here, not Paula.  Got the e-mail

5  to prove it.

6      Another e-mail that's relevant to this case --

7      Go to Exhibit 114, please.

8      Similar tone, similar tenor, from Barry to Paula,

9  October 30th, 2014, three days after he filed this lawsuit.  He

10  sends her this e-mail, attaches a copy of the complaint in this

11  case.  There's the date.

12      He had just found -- according to his story, he had

13  just found out about the e-mails that she saw.  Right?  Read

14  this; read the other e-mails that he sent her, the last e-mail

15  during evidence.  Ask yourself whether he's emotionally

16  distraught as his attorney claimed, that he can't sleep, that

17  he doesn't have any trust issues -- which, by the way, if

18  anybody in the room has trust issues, it's the lady at my

19  table, not Mr. Epstein -- Dr. Epstein.

20      Okay.  "So his greed, your loss.  I could have told

21  you.  I've also filed criminal complaints against both of you

22  with the FBI.  Returned" -- "Reported him to the disciplinary

23  body for bad shysters."

24      This is what he is.  This is the kind of guy he is.

25      Plaintiff in her opening statement made him out to be

Opening Statement - Defense

1    an innocent babe in the woods.  When you see all the evidence,

2    when you consider it at the end of the case, you're going to

3    tell yourselves one thing, I think:  Give me a break.  Give me

4    a break, Mr. Epstein -- Dr. Epstein.  Give me a break.

5              Talk to you for a minute about Janet Geovanis.

6              He started rekindling a relationship with this lady in

7    March of 2011, about the same time that he was exchanging

8    e-mails with Rose Vivian.  Okay?

9              Let's go to Exhibit 56.  Okay.  All right.  Keep

10   scrolling.  Keep scrolling.  All right.  Scroll down all the

11   way.

12             I know everybody's trying to get out of here, so I'm

13   not going to read all these things to you.  But we're at

14   March 3rd, 2011, Janet Geovanis to Barry Epstein.  All right?

15             Now, in and of itself, some of this stuff is playful,

16   I wouldn't say romantic.  You can make your own conclusions

17   about it.  Maybe you would consider it romantic, right?  But

18   it's playful.  He's grooming her like he'd done with Janice,

19   like he'd done with Rose.  He's grooming Janet for a

20   relationship.

21             Scroll up, please.  Let's see when Paula is accessing

22   these.  Let's keep going.

23             Okay.  Barry to Paula, April 28th.  Now, this is about

24   a month after she had started seeing e-mails between Barry and

25   Rose.  Paula is continuing to access -- I'm sorry -- continuing

Opening Statement - Defense

1    to approach Barry, confront him:  "Who is Rose?  Tell me about

2    Rose.  Let's talk this out.  Let's figure this out."

3              Now she sees another woman is in the mix.

4    Devastation.  That's why she's forwarding these to herself.

5    That's why she's accessing these.

6              She never turned these over until three days before he

7    filed suit.  If she was going to use them in the divorce to

8    leverage a better settlement out of him, she would have done it

9    years sooner.

10             As plaintiff's attorney said, she filed for divorce in

11   May of 2011.  But it wasn't until three years later that they

12   were going to go to trial, the divorce judge was about to split

13   up his precious money, and he said, "Uh-uh.  That ain't going

14   to happen.  We're going to the federal courthouse.  I'm going

15   to be the one that gets the unfair financial advantage."

16             I want to make a couple comments about these Janet

17   e-mails.  There was some statements by plaintiff's counsel

18   saying that Paula is sophisticated in computers.  No offense,

19   but that's nonsense.  You ain't sophisticated in computers.

20   She ain't sophisticated in computers.  She's a librarian.  She

21   never had training in computers.  She had no idea what an

22   auto-forwarding rule was.  She didn't know a rule from Aruba.

23   She didn't have any help.  She didn't know what she -- she

24   didn't know what a rule was.  She didn't know how to apply one.

25             So let's see some of these e-mails.

Opening Statement - Defense

1          All right.  Scroll down.

2          This is Exhibit 56 at the top here, right?  Okay.  So

3    the last e-mail in the chain between Barry and Janet --

4          Scroll down.  Scroll back up.  Scroll back up.  Up,

5    up, up.

6          Okay.  March 3rd.  See that?  March 3rd, 2011.

7          Scroll back up.

8          First forwarded -- forwarded a month and a half later.

9    If this was an auto-forwarding rule, it would have been

10   instantaneous.  Same second, while the e-mail was in transit,

11   there would have been a copy made and delivered to Paula.  This

12   is a month and a half after.

13         Okay.  So, again -- and now bear in mind March 3rd was

14   this last e-mail chain.

15         Go to Exhibit 57.

16         March 3rd, forwarded on April 28th at 7:26 p.m., was

17   56.  This one was forwarded on the same day, two minutes

18   earlier.  When was the last e-mail sent?  Two weeks after,

19   March 18th, two weeks after -- more than two weeks after the

20   prior one.

21         So if there was auto-forwarding going on, ladies and

22   gentlemen, this would have arrived in Paula's inbox two weeks

23   after the March 3rd -- 15 days after the March 3rd one.  It

24   arrived two minutes earlier than the prior.  There was no

25   auto-forwarding going on.

Opening Statement - Defense

1    Our forensic expert, Tim Doris, is going to tell you

2    that, that among many other things about why Paula didn't do

3    what plaintiff is accusing her of doing.

4    Now, there was a number of other people that Paula --

5    that plaintiff's attorney referred to.  The mother, the sister,

6    the -- does he have a brother?  No, he doesn't.  She said

7    brother.  There is no brother.  All right?

8    Mother and the sister.  Barry intentionally sent

9    e-mails to Paula about his mother and his sister.  I'll show

10   you those during the trial.  He intentionally sent them because

11   he wanted her to see what they were bickering about.  He

12   intentionally sent them.  She didn't obtain them, access from

13   his e-mail account.

14   And we can show that he routinely -- about his work,

15   his business.  He routinely sent e-mails to her intentionally

16   about his work, about his accomplishments, about his partners

17   that he hated.  He intentionally sent it to her because he was

18   looping her in on the goings-on in his business.  All right?

19   So Exhibit 33.

20   Okay.  This doesn't have a whole lot of spice to it,

21   but it kind of sets the stage.  Barry, Friday, August 6, 2010,

22   sending Paula a digital image of the book.

23   Scroll down.

24   "Hey, look.  This is my book."

25   Keep -- back up, back up.  Right there.

Opening Statement - Defense

1      Barry Epstein:  "Hey, this is my book, my last hurrah.

2   This is the last edition of my GAAP book."  Generally accepted

3   accounting principles is what GAAP means.

4      All right.  Exhibit 35.

5      Okay.  This is a -- this is an example of an e-mail

6   that Barry intentionally sent to Paula where plaintiff is

7   accusing her of stealing.  Okay?

8      This e-mail is about his firm and the loan to their

9   firm from MB Financial Bank.  All right?  Barry, November 17th,

10  2010, to Leanne Levy.  She's a representative of MB Financial

11  Bank, his firm's lender, to the partners.  All right?

12      Scroll down.

13      He is telling her that "If you want me to guarantee

14  the firm debt, I need more time," is essentially what he's

15  doing.  All right?  And Ms. Epstein will say that he blind-

16  copied her on this just so she could see what was going on with

17  his partnership.  He's the one with the money in the

18  partnership.  He's the one that's keeping it afloat.  He wants

19  her to know that.  That's what Mrs. Epstein is going to tell

20  you.  All right?

21      Now, three weeks later.  Two weeks, three weeks.

22  Exhibit 37.

23      All right.  Okay.  December 7, 2010:  "Paula,

24  million-dollar baby."  First he's bragging that Congress had

25  extended the estate tax holiday as if it was his responsibility

Opening Statement - Defense

1   and it's his achievement.  Right?  Then the next paragraph, it

2   says, "In other breaking news, the bank is refusing to give the

3   firm money, to loan the firm money without my financials.  And

4   I'm calling a meeting of the partners."

5           That was the same subject in that exhibit we just

6   looked at, Exhibit 35, the same subject that he was e-mailing

7   MB Financial.  This shows that he blind-copied her on a number

8   of e-mails between him and his partners.  Number, few, right?

9   But it's not the extent -- she's not stealing e-mails from

10  between him and his partners to gain some kind of an advantage.

11  He's doing it on purpose.

12          Now, she will say that sometime in 2011, after she had

13  filed for divorce, she may have obtained some of those e-mails

14  between him and his partners on his account.

15          She'll say -- and you're going to believe her, not

16  him.  She'll say, "I sent them to myself because I couldn't

17  believe it.  He's -- he's supposed to be this brilliant

18  financial guy, numbers guy.  He's supposed to be holding his

19  firm up.  Why can't he -- why is he having so much trouble at

20  work?  Why is he just not getting along with his partners?"

21  That's why she did it.

22          If you're asking yourself -- but that doesn't really

23  make a whole lot of sense.  What if you were cheated on four

24  times?  How would you feel?  That's what she did.  That's the

25  form her grief was taking.  All right?

Opening Statement - Defense

1          Exhibit 39.  Still along the same lines as the work
2   e-mail.  Okay.  This isn't the one I wanted to show you.  This
3   is about him and his daughter.  This is -- okay.
4          Sorry, ladies and gentlemen.  I misnumbered them.
5   Give me one second here.  We'll figure it out.
6          Did I say 39?  I meant 38, of course.  Sorry.
7          Okay.  This is Barry's intentional e-mail to Paula:
8   "For your entertainment (not mine)."
9          Fred Lieber is a partner of his.  December 9, 2010,
10  they're talking about their partners and how their partners are
11  wasting the firm's money.
12         Keep scrolling down.
13         You can take a look at it if you want.
14         So Barry is intentionally sending Paula e-mails about
15  his partner.  She's not stealing them.  She's not obtaining
16  access to them on his work accounts.  He's sending these to her
17  on his own.
18         THE COURT:  Since it's going to come up during the
19  trial, why don't you explain what the notations are at the
20  bottom of the document.  It applies to exhibits on both sides,
21  but one of you needs to explain it.
22         MR. SCHAEFERS:  PAULA 2610?  Yeah, that's the number
23  that I put on.  It's a serial number for documents in
24  litigation so we can track when it was produced, what number it
25  is, and so we can identify it in the record for the judge or

Opening Statement - Defense

1   for other people.  It's called a Bates number and named after

2   the guy who invented the Bates stamp that you stamp on each

3   page.  Now it's electronic.  But that is not original to the

4   document.  That's something we put on it and they put on their

5   documents for the purposes of litigation.  Thank you.

6           THE COURT:  You'll see it on documents on both sides,

7   but they are not created at the time of the documents

8   themselves.  They're put on later for litigation purposes.

9           All right.  Go ahead.

10          MR. SCHAEFERS:  Now, there's a complaint by him that

11  she accessed his work e-mails and that he had an expectation of

12  privacy in his work e-mails and it was none of her business.

13  It was off limits.

14          Well, Exhibit 131 again, please.

15          Here's an admission by him virtually that work e-mails

16  are not covered by the Wiretap Act and, by extension, the

17  Stored Communications Act.

18          Go to pages 3 and 4.  Okay.  Okay.

19          So I asked him a question.  Remember that

20  December 16th e-mail that I showed you about him threatening

21  with the FBI and threatening to -- she's going to go to prison

22  unless she accepted a cut-rate settlement in the divorce case?

23  All right.

24          So I asked him:  "What were all the 'Years ago I told

25  you about the illegality of breaching electronic

Opening Statement - Defense

1   communications'?  What was that all about?  Tell me all of

2   that."

3         Well, here's what he said.  He said, "Well, it must

4   have been in November of 2013," which would have brought it

5   within the limitations period.  So he's making stuff up.  But

6   in making stuff up, he kind of shot himself in the foot.  All

7   right?  He said, "Consequence of changes in my firm's

8   affiliation and management, it was brought to my attention that

9   employers may read employees' e-mails but that only those work

10  e-mails are excluded from the Wiretap Act."

11        This is under oath in this lawsuit, "excluded."  He's

12  admitting that he doesn't have an expectation of privacy in his

13  work e-mails.  So any of the e-mails that she saw on her home

14  computer to or from his RNCO address, they don't count.  You

15  can't find her in violation because he's admitting that they're

16  not private and they're excluded from the Wiretap Act.

17        Now, yes, Paula will tell you that she did access some

18  of his e-mails with his divorce attorney.  Couple things on

19  that.  One, these are with his RNCO address.  The address that

20  he told Rose Vivian, remember, on August 12, 2011, that was

21  being -- that his employer was looking at -- or that he's going

22  to tell you.  Okay?

23        So pull up Exhibit 84.

24        Yes, she did obtain access to some of his e-mails with

25  his divorce attorneys in December of 2011.  But what's the big

Opening Statement - Defense

1    deal?  I'm going to show you the content of it.

2            Yeah, this is his attorney, Azita Amojarad.

3    October 4th, 2011, she's sending him this e-mail.

4            Again, scroll down.  I'm sorry.  Scroll back up.

5    Okay.

6            Again, his work e-mail address.

7            A juror has a question, Judge.

8            THE COURT:  Yes, sir?

9            A JUROR:  I'm sorry.  What exhibit is this?

10           MR. SCHAEFERS:  Exhibit 84.  84.

11           A JUROR:  Sorry.

12           MR. SCHAEFERS:  You bet.

13           Okay.  So scroll down.

14           All she's telling him is that he's dragging his feet

15   on producing information in the divorce case that's just going

16   to keep extending it out and dragging it out.  That's all she's

17   telling him:  "You've got to comply with the court orders.  The

18   judge is going to drop the hammer on you if you don't do what

19   he says."

20           So to the extent that he gets up here and tells you

21   that it was Paula and her divorce attorney that were dragging

22   out the divorce, think of this.  And there's other e-mails to

23   prove that he was the one dragging his feet because, again,

24   this is his vendetta.  He doesn't want her to get a cut of his

25   precious money, what he believes is his precious money.

Opening Statement - Defense

1      Now, as I said -- if I didn't say it, I'm saying it

2    now.  She stopped access -- accessing his e-mails in March of

3    2012.  By then the divorce was in full swing.  She knew she was

4    going to leave him.  She had all the reminders that she needed

5    that he was a bad guy and she had to get away from him.  She

6    didn't need to access his e-mails anymore.

7      Well, March of 2012 is well outside the statute of

8    limitations period.  All right?

9      Our expert, Timothy Doris, is going to say, "You know

10   what" --

11     MS. LANE:  Your Honor, objection.  He's referring to

12   law with the statute of limitations.  That's not for the jury.

13   It's mischaracterizing the law.  Paula Epstein was not the

14   employee --

15     THE COURT:  All right.  We don't need to hear

16   argument.

17     Just move on to what the evidence will show.  Okay?

18     MR. SCHAEFERS:  Okay.

19     THE COURT:  You can show dates that you think certain

20   things were apparent to certain people.  But legal arguments

21   remain with me, not with the jury.

22     MR. SCHAEFERS:  The evidence will show Tim Doris, he

23   looked through thousands of e-mails electronically with

24   specialized equipment.  He's a forensic expert.  He didn't find

25   any e-mails after March of 2012 that Paula may have obtained

Opening Statement - Defense

1    from Barry's account.

2          And neither of the experts that plaintiff hired --

3    neither -- well, experts. Neither of the computer specialists,

4    I'll call them, found any e-mails after March of 2012. You

5    know what? You know what else? They didn't find any e-mails,

6    period, in Barry's accounts.

7          I take that back. He didn't even give them access to

8    his own personal accounts to see if there was any e-mails that

9    Paula may have inappropriately forwarded.

10         You're going to hear testimony from Matthew Feilen,

11   F-E-I-L-E-N. He's a guy they hired to testify as a computer

12   forensic expert. He's going to tell you, "You know what? When

13   I was hired on May 17th, 2017, in order to render an expert

14   opinion on whether -- on certain computer forensic issues, I

15   asked for access to Barry's e-mail accounts."

16         Straight from the mouths of babes. That's what he's

17   going to say: "I asked for access. I didn't get it. They

18   didn't give it to me." I call it a refusal. It might not be a

19   refusal. He didn't get it. He didn't want him to see his

20   e-mail account.

21         At his deposition in this case, Barry said, "I deleted

22   e-mails from my e-mail account. I did it regularly. I even

23   did it after this lawsuit was filed, after I knew that my

24   e-mails were at issue."

25         He's suing over e-mails, and he's deleting them,

Opening Statement - Defense

1    deleting them at the same time.  Anybody has anything to hide,

2    it ain't Paula.  It's Barry.

3            MS. LANE:  Objection, your Honor.  Again, he's not

4    stating what the evidence will show.  He's --

5            THE COURT:  Overruled.

6            Continue.

7            MR. SCHAEFERS:  Okay.

8            So damages.  There was some talk about damages.  Start

9    with punitive damages.  She's asking for punitive damages.  You

10   only get punitive damages if your conduct is willful and

11   malicious.  If anybody is willful and malicious, it's on that

12   side of the room, not here.

13           Even if by some stretch of the imagination what she

14   did was against the law, it certainly was not malicious or

15   willful.  She never turned -- she turned over the e-mails to

16   her divorce attorney only after he asked for them.

17           He invited the production of e-mails, I think -- beg

18   your pardon.  Strike that.

19           He invited the turnover of e-mails, the evidence will

20   show, in order to sue her, in order to put the divorce case on

21   hold.  And you know what?  That's exactly what he did.  The

22   divorce case was supposed to go to the asset division trial in

23   mid-November of 2014.  He filed a lawsuit on October 27th,

24   2014, in this courthouse.  Immediately filed a motion in the

25   divorce case to strike the trial date and continue it out.

Opening Statement - Defense

1    He filed a motion to disqualify Jay Frank because he

2  had turned over these e-mails in the divorce case, which was

3  eventually denied on March 3rd of 2015, the evidence will show.

4  So that's five months, six months in the divorce case that was

5  wasted because he had to file this lawsuit because he thought

6  he could get away with asking you to remedy violations of his

7  e-mail privacy.

8    Now, you might hear evidence from -- about his

9  so-called emotional damages -- Dr. Michael Fields, a local

10  psychologist, a guy that's worked with Ms. Lane I don't know

11  how many times in the past for money.  Ms. Lane referred -- the

12  evidence will show -- Mr. Fields will testify -- Dr. Fields

13  will testify that Ms. Lane referred Barry to Dr. Fields on

14  May 17th, 2017, two and a half years after he filed this

15  lawsuit.  If he's in such emotional distress, why is he waiting

16  two and a half years to go see a psychologist at the behest of

17  his attorney?  And the same psychologist that she has a prior

18  business relationship with.

19    Dr. Fields is going to say, "Yeah, he's angry about

20  all this stuff, and he's emotionally distraught."

21    Well, guess what?  His -- his opinions are not going

22  to hold up.  This is a DSM-5.  This is the bible for

23  psychology.  This talks about all the codes, all the diagnostic

24  criteria, what you need to find in order to render a diagnosis.

25  All right?

Opening Statement - Defense

1    You'll -- the evidence you'll hear is that Barry's

2  self-report to Dr. Fields of his conditions met at least two of

3  the four criteria for malingering.  Malingering is faking,

4  faking injury.

5    He was in the middle of a lawsuit that was about to go

6  to trial.  He had to prove some kind of damage, so he went to

7  this -- to this psychologist in order to drum up just some kind

8  of emotional damage claim.  He was sent by his attorney.

9  That's also specifically referenced in the DSM-5 as a sign of

10  malingering.

11    Also, after Dr. Fields submitted his report, his

12  expert report which you'll see, June 4 -- June 12th, 2017, the

13  date of the report -- after he submitted it, Barry never saw

14  him again.  That's the second sign of malingering according to

15  the DSM-5: faking symptoms, faking bad.  If you don't follow up

16  on the treatment regimen prescribed by the psychologist, that's

17  a strong sign of malingering.

18    So it's a lot of hooey is what I'm saying about

19  Dr. Fields' opinion.  Not only that, but he didn't read one

20  e-mail.  None of these e-mails, which are just a subset of the

21  e-mails.  He didn't read one of the e-mails.  He didn't read

22  any of the deposition transcripts.  He didn't read his

23  complaint.  He didn't read my responses.  He didn't read

24  anything.  He just took Barry's word for how he was feeling.

25    He's also going to talk briefly about some of these

Opening Statement - Defense

1    psychological tests that he administered on Barry on June 8th,

2    on the third visit, third and final visit.  Well, he's also

3    going to tell you that these tests are loaded.  Yeah, they're

4    recognized in the legal community as possibly, you know, giving

5    you some kind of insight into the person's mind.

6           But one of the tests says, "You feel depressed always?

7     Sometimes?  Never?"  Smart guy like that who is in the middle

8    of a lawsuit that needs to prove some kind of damage knows how

9    to answer those questions so that it will show up -- so that a

10   psychologist might think that he's actually suffering.

11          So nothing that Dr. Fields is going to tell you about

12   Barry's so-called emotional conditions is going to have any

13   weight.  You're probably going to reject it anyway.

14          So I'll wrap up.  All right?

15          There's five counts here.  Count I, Wiretap

16   Communications Act.  In order to succeed, you have to prove

17   there was contemporaneous interception, interception of an

18   e-mail while it was in transit.

19          Well, every single e-mail -- not every single e-mail.

20   Many of the e-mails you'll see show that Paula accessed them

21   and forwarded them to herself months, years, some cases hours

22   after.  That's not during transit, and the law is that's not a

23   violation of the Wiretap Act.

24          It's also not a violation of the Wiretap Act if the

25   plaintiff consents.  Consent can be explicit or implied.

Opening Statement - Defense

1    MS. LANE:  Objection, your Honor.  Mischaracterizing

2    the law.

3    THE COURT:  All right.  Well, he's -- talk about what

4    the evidence is going to show.  Closing argument is when you

5    discuss what the law is.

6    MR. SCHAEFERS:  The evidence is going to show that he

7    knew she was accessing his e-mails.  He didn't care; he didn't

8    stop it.  So he consented.  That's what the evidence is going

9    to show.  That's Count I.

10    Count II, Stored Communications Act.  I didn't object

11    to her misstatement of the Stored Communications Act.  Stored

12    Communications Act only outlaws the access of e-mails.  What

13    you do with them afterward is irrelevant to the Stored

14    Communications Act.  It's only if you access the e-mails

15    without authorization.

16    Well, in this case the authorization is the consent.

17    The evidence will show that he knew.  He didn't care, didn't

18    stop it, didn't change his passwords, continued e-mailing on

19    his home computers for Paula to see: consent.  No violation of

20    the Stored Communications Act.

21    Now, for Counts I and II, there's a two-year statute

22    of limitations.  You'll find that he certainly either

23    discovered or had a reasonable opportunity to discover Paula's

24    accessing his e-mails long before the two-year limitations

25    period.  So he ran -- the time ran out on him, and it ran out

Opening Statement - Defense

1    because he didn't care.

2         MS. LANE:  Your Honor, I'm going to object for the

3    record.

4         THE COURT:  All right.  Well, it was not -- he already

5    said it.  So objection is overruled.  You've got to object --

6         MR. SCHAEFERS:  Count IV --

7         THE COURT:  -- during his statement if you're going to

8    have it count.

9         MR. SCHAEFERS:  Count IV, intentional infliction of

10   emotional distress.  Also, too, I skipped Count III.  I'll come

11   back to it in a minute.

12        Count IV, there's also a two-year statute of

13   limitations.  Same thing: barred.  He knew, didn't care.  He --

14        MS. LANE:  Same objection.

15        MR. SCHAEFERS:  -- the clock ran out.

16        THE COURT:  Objection sustained.  We're not talking

17   about statute of limitations.  Talk about the time of

18   discovery, and then you can --

19        MR. SCHAEFERS:  Okay.

20        THE COURT:  -- talk about statute of limitations later

21   in your closing argument.

22        MR. SCHAEFERS:  Beg your pardon.  Okay.

23        He knew -- you're going to find the evidence will show

24   that he knew in October of 2008, he knew in August of 2011, and

25   he knew at every time thereafter that Paula was accessing his

Opening Statement - Defense

1    e-mails.  So he had the opportunity to discover it or he had

2    discovered it, so that's when the clock started running.

3            Also, for intentional infliction of emotional

4    distress, the conduct has to be extreme and outrageous.  The

5    evidence will not show that this is extreme and outrageous.

6            She did it because she was devastated.  There was at

7    least four betrayals: two with one woman, one with each of two

8    other women.

9            It's not extreme and outrageous if you keep evidence

10   of your spouse's infidelity because you're devastated, because

11   you can't believe what's going on.  Nor did Paula, the evidence

12   will show -- nor did she intend to cause severe emotional

13   distress, also a requirement for intentional infliction.  She

14   didn't intend.  She kept these e-mails to herself, the evidence

15   will show.  The evidence will show that she never told anybody

16   about it, turned them over to anybody until he asked for them.

17           Count V, unauthorized trespass to chattels.  Well, it

18   wasn't unauthorized.  Living together -- the evidence will show

19   that they were living together.  He knew this was happening on

20   their shared home computers.  It was not an unauthorized

21   trespass.

22           You also have to show under Count V, trespass to

23   chattels, that there was damage to some physical property or at

24   least some physical data.  The evidence will show she never

25   deleted anything.  She didn't destroy any of his computers.

Opening Statement - Defense

1    She didn't make them harder to use.

2           Count III, unreasonable intrusion upon seclusion.  The

3    conduct has to be highly offensive or objectionable to a

4    reasonable person.  If he's accessing his -- if she's accessing

5    his e-mails for the reason I've stated umpteen times today,

6    that's not highly offensive.  It's not objectionable to a

7    reasonable person.

8           Finally, for intrusion upon seclusion, Count III, it

9    has to be unauthorized.  And I won't tell you again why it

10   was -- was not.

11          So after the trial, after you get the jury

12   instructions, after you hear our closing arguments, you're

13   going to weigh all the evidence, you're going to decide who to

14   believe, Paula or Barry.  Confident you'll find for Paula on

15   all counts, finding in favor for the defendant and against

16   plaintiff.

17          Thank you for your time.

18       (Excerpt proceedings concluded at 4:36 p.m.)

19       (Proceedings had not herein transcribed.)

20                    C E R T I F I C A T E

21       I certify that the foregoing is a correct transcript of the

22   excerpt of proceedings in the above-entitled matter.

23

24   */s/ LAURA R. RENKE*                    *August 28, 2017*
     LAURA R. RENKE, CSR, RDR, CRR
25   Official Court Reporter